POMERANTZ LLP
Jennifer Pafiti (SBN 282890)
Austin P. Van (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York   10016
Telephone:   (212) 661-1100
jpafiti@pomlaw.com
avan@pomlaw.com

*Counsel for Lead Plaintiff*

— additional counsel on signature page —

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOHAMMED USMAN ALI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>FRANKLIN WIRELESS CORP., OC KIM, and DAVID BROWN,<br><br>Defendants. | **Case No. 3:21-CV-00687-AJB-MSB**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................... 4

III.   PARTIES ............................................................................................. 5

    A.    Lead Plaintiff ............................................................................ 5

        1.    Gergely Csaba ................................................................ 5

    B.    Defendants ................................................................................ 5

        1.    Franklin Wireless Corporation ...................................... 5

        2.    Individual Defendants .................................................... 6

IV.    SUBSTANTIVE ALLEGATIONS ..................................................... 7

    A.    Background ................................................................................ 7

        1.    Franklin's Business ........................................................ 7

        2.    Franklin's Supply Contract with Verizon for Ellipsis
            Jetpacks ........................................................................... 8

    B.    The Jetpacks' Batteries Were Dangerously Defective .................. 8

    C.    Franklin's Revenue from the Sale of its Jetpacks to a Limited Set of
        Customers Was Material to Franklin's Overall Business and Viability ...... 9

    D.    Scienter—The Company Was Fully Aware that the Jetpacks Were Prone
        to Overheat and Catch Fire, But Never Disclosed These Known Risks to
        Investors ....................................................................................... 9

        1.    Confidential Witness 1 ("CW1") ................................. 10

        2.    Confidential Witness 2 ("CW2") ................................. 12

        3.    Confidential Witness 3 ("CW3") ................................. 13

        4.    Confidential Witness 4 ("CW4") ................................. 14

V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
    OMISSIONS ..................................................................................... 15

    A.    September 17, 2020 Annual Report ................................................ 15

    B.    November 16, 2020 Quarterly Report ........................................ 17

    C.    February 16, 2021 Quarterly Report .......................................... 17

VI.    LOSS CAUSATION ............................................................................ 17

    A.    April 1, 2021 ................................................................................ 17

    B.    April 8, 2021 ................................................................................ 18

    C.    April 9, 2021 ................................................................................ 19

VII.    CLASS ACTION ALLEGATIONS ................................................... 19

VIII.    NO SAFE HARBOR ........................................................................... 23

IX.    COUNT ONE  For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 (Against All Defendants)....................... 23

X.    COUNT TWO  For Violations of Section 20(a) of the Securities Exchange Act of 1934 (Against the Individual Defendants) ........................................ 25

XI.    PRAYER FOR RELIEF ...................................................................... 26

XII.    JURY TRIAL DEMANDED ............................................................... 26

Court-appointed Lead Plaintiff Gergely Csaba ("Lead Plaintiff" or "Csaba"), by and through undersigned counsel, brings this federal securities class action individually and on behalf of all other persons and entities (the "Class"[1]) who purchased or otherwise acquired the common stock of Franklin Wireless Corporation ("Franklin" or the "Company"), between September 17, 2020 and April 8, 2021, inclusive (the "Class Period").

Lead Plaintiff's claims are brought upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of (1) reports and documents filed by Franklin with the U.S. Securities & Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Franklin and its business; (3) press releases, news articles, transcripts, and other public statements issued by or about Franklin, its business, and the Defendants; (4) an investigation conducted by Lead Plaintiff's attorneys and their staff that included interviews with numerous confidential witnesses ("CWs"), including former Franklin employees; (6) consultations with experts; and (7) other publicly available information concerning Franklin, its business, and the allegations contained herein.

## I.   INTRODUCTION

1.   This is a federal securities class action against Franklin and two of its senior-most executives seeking damages and other legal and equitable remedies to redress harms caused by Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act, *codified as amended*, 15 U.S.C. §§ 78j(b) & 78t(a), and of SEC Rule 10b–5, *codified as amended*, 17 C.F.R. § 240.10b–5.

---

[1] The following are excluded from the Class:  (1) Defendants; (2) members of the immediate family of any Defendant who is a natural person; (3) any person who was an officer or director of the Company during the Class Period; (4) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (5) the Company's employee retirement and benefit plan(s), if any, and their participants or beneficiaries; and (6) the legal representatives, affiliates, subsidiaries, parents, heirs, heirs apparent, successors-in-interest, or assigns of any such excluded person or entity.

2.     Franklin provides wireless solutions, including mobile hotspots, routers and modems, and markets and sells its products directly to wireless operators, and indirectly through partners and distributors.

3.     Defendants' conduct at the center of this Complaint was abominable. Defendants knew that Franklin's core product dangerously overheated, risking severe injury to their consumers, which included school-age children, yet failed to disclose this critical fact to the public to prevent a collapse in the Company's value.  Beginning in April 2017, Franklin imported and sold millions of defective mobile hotspot devices ("Ellipsis Jetpacks" or "Jetpacks" or "Hotspots") to customers in the United States, including 2.5 million to its largest customer, Verizon Wireless, Inc. ("Verizon").  Most of these devices ultimately were sold or leased by Verizon to school districts for use by school-aged children in the United States.  Franklin knew, but did not disclose, that these devices were manufactured with defective lithium-ion batteries that posed a serious safety hazard because the batteries could overheat and cause severe burns and, in some cases, could catch fire, causing severe harm to life and property.  Indeed, the CEO of Franklin, Defendant Kim, personally requested and received investigative reports of the burned devices as far back as 2019, and so was fully aware of these hazards. Nevertheless, only after Verizon announced, on April 8, 2021, that it was recalling the hotspot devices, did Franklin finally acknowledge (the next day, on April 9, 2021) that its devices were defective and had caused injury on at least fifteen (15) occasions between April 2017 and April 8, 2021.

4.     The Company's SEC filings directly implied that Franklin's devices were not suffering from any noteworthy failures.  Moreover, the Company was under an obligation to disclose, yet failed to disclose, that the Ellipsis Jetpacks that Franklin sold to its customers from as early as April 2017 through September 17, 2020 had defective batteries that Defendants knew could cause the devices to overheat and pose a fire hazard and that the Company's customers would recall the Ellipsis Jetpacks.

5.      But-for Defendants' wrongful acts and omissions, the market value of Franklin's securities would not have been artificially inflated and Lead Plaintiff and members of the Class would not have been injured.

6.      The truth was revealed in a series of corrective disclosures beginning on April 1, 2012 and ending on April 9, 2021:

(a)      On April 1, 2021, Franklin stated that it ha[d] been notified of reports of battery issues in some of its wireless hotspot devices," and stated that "[t]he [C]ompany is working with its battery and device manufacturing partners and carrier customer to determine the cause and extent of the problem."  On this news, the price of Franklin's shares fell by $0.35 per share, or 1.65%, to close at $20.77 per share on April 5, 2021, the next trading session.

(b)      On April 8, 2021, CNBC reported that Franklin's customer, Verizon, was "recalling 2.5 million" "Ellipsis Jetpack mobile hotspots imported by Franklin Wireless Corp. and sold between April 2017 and March 2021" and that "[t]he affected models are labeled: MHS900L, MHS900LS and MHS900LPP," "after discovering that the lithium ion battery can overheat, creating a fire and burning hazard," and that "just over 1 million of the recalled devices are currently in use, meaning currently or recently used by customers."  According to CNBC, "Verizon had received 15 reports of the hotspots overheating.  Six of those reports included incidents of fire damage to bedding or flooring and two involved minor burn injuries," and that "[s]ome of the hotspots were supplied to students by their schools to continue remote learning."

(c)      Also on April 8, 2021, the United States Consumer Product Safety Commission ("USCPSC") issued Recall Number 21-106 and published a notice of Verizon's recall of Franklin's "Ellipsis Jetpack mobile hotspots," identifying that "[t]he lithium ion battery in the hotspots can overheat, posing fire and burn hazards." According to the USCPSC, "Verizon has received 15 reports of the hotspots overheating, including six reports of fire damage to bedding or flooring and two reports of minor burn injuries."  Additionally, the USCPSC advised "[p]arents whose children

received the recalled Ellipsis Jetpack from their schools" to "contact their school for instructions on how to receive a free replacement device and return their recalled Ellipsis Jetpacks." On this news, the price of Franklin's shares fell by $2.82 per share, or 14%, to close at $17.33 per share on April 8, 2021.

(d)     On April 9, 2021, Franklin stated that its customer, Verizon, "has issued a voluntary recall of its Jetpack Hotspot devices imported by Franklin," adding that "Franklin is continuing to work with its battery and device manufacturing partners to determine the cause and extent of the concerns."

(e)     On this news, the price of Franklin's shares fell by $4.07 per share, or nearly 23%, to close at $13.26 per share on April 9, 2021.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Franklin's securities, Lead Plaintiff and other members of the Class have suffered significant damages.

## II.     JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act"), *codified as amended*, 15 U.S.C. §§ 78j(b), 78t(a), and pursuant to the rules and regulations duly promulgated thereunder, including SEC Rule 10b–5, *codified as amended*, 17 C.F.R. § 240.10b–5.

9.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a case or controversy arising under the federal securities laws, and pursuant to the plain language of Section 27 of the '34 Act, *codified as amended*, 15 U.S.C. § 78aa.

10.     Venue is proper in the Southern District of California pursuant to Section 27 of the '34 Act, *id.* § 78aa, because Defendants transact business in this District and because the Company's principal place of business is located at 9707 Waples Street, Suite 150, San Diego, California 92121, which is situated within this District. Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(d) because many of the acts and transactions that constitute the violations of law complained of in this Amended

Complaint, including the dissemination to the public of materially false or misleading statements, occurred in this District.

11.   In connection with the acts, omissions, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, the facilities of the national securities markets, and interstate telephonic and digital communications systems.

## III.   PARTIES

### A. Lead Plaintiff

#### 1.   Gergely Csaba

12.   Csaba is domiciled in Budapest, Hungary.  Csaba purchased or otherwise acquired Franklin common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures alleged herein, as set forth in the Declaration of Gergely Csaba ¶ 2, ECF No. 6-6 (June 15, 2021), attached as Exhibit D to the Declaration of Jennifer Pafiti in Support of Motion of Gergely Csaba for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Counsel, ECF No. 6-2 (June 15, 2021) (the "Pafiti Decl."), and incorporated herein by reference.

### B. Defendants

#### 1.   Franklin Wireless Corporation

13.   Franklin is a Nevada corporation, with its principal executive offices located at 9707 Waples Street, Suite 150, San Diego, California 92121.

14.   The Company's securities trade in an efficient market on the NASDAQ under the ticker symbol "FKWL."

15.   Franklin is liable for the acts of its executives, directors, officers, and agents at common law and under the doctrine of *respondeat superior* because all the wrongful acts and omissions complained of in this Amended Complaint were carried out during and within the scope of each such person's employment.  The scienter of

Franklin's executives, directors, officers, and agents is similarly imputed to Franklin under established agency principles.

## 2. Individual Defendants

16. Defendant OC Kim ("Kim") is and was, at all relevant times, President and Chief Executive Officer of Franklin, reporting to the Company's Board of Directors. Kim transacts and transacted, at all relevant times, Franklin's business out of Franklin's principal executive office in San Diego. Kim is and was, at all relevant times, domiciled in the City of San Diego, County of San Diego, California. Kim is and was, at all relevant times, responsible for Franklin's management, operations, sales and marketing, new investment sources and funding opportunities, Company strategy, and product management. Kim has held the role of President and Secretary since September 2003 and served as the Company's Acting Chief Financial Officer from April 2018 until March 2021. In the past, Kim was the Chief Executive Officer and President of Accetio Inc., a developer of mobile devices and modules for the telecommunications industry that merged with Franklin in September 2003. The Company touts Kim's "extensive business, operational and management experience in the wireless industry, including his current position as the Company's President," and claims that Kim's "knowledge of the Company's business, products, strategic relationships and future opportunities is of great value to the Company." Kim signed the Company's annual report dated September 17, 2020, filed on SEC Form 10-K. Additionally, Kim signed the Company's quarterly reports dated September 30, 2020 and December 31, 2020, filed on SEC Form 10-Q. Further, Kim signed certifications pursuant to 17 C.F.R. §§ 240.13a–14(a) & 240.15(d)–14(a), promulgated under section 302 of the Sarbanes-Oxley Act of 2002, *codified as amended*, 15 U.S.C. § 7241, and pursuant to section 906 of the Sarbanes-Oxley Act of 2002, *codified as amended*, 18 U.S.C. § 1350, attesting to the veracity of the statements in each of the foregoing SEC filings.

17. Defendant David Brown ("Brown") is and since March 2021, has been Franklin's Acting Chief Financial Officer, reporting to Kim. Brown transacts and

transacted, since March 2021, Franklin's business out of Franklin's principal executive offices in San Diego.

18.    All references to "Individual Defendants" in this Amended Complaint are to Kim and Brown.

19.    All references to the "Defendants" in this Amended Complaint are to Franklin, Kim, and Brown, jointly and severally.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

#### 1.    Franklin's Business

20.    Franklin claims to have a "global customer base" to which it provides wireless solutions, including but not limited to multinational telecommunications conglomerates, other wireless operators, strategic partners, and distributors located primarily in the United States.  Among other things, Franklin sources, manufactures, and supplies its customers with 5G/4G mobile hotspot devices, routers, trackers, and other similar mobile device management ("MDM") solutions.

21.    Franklin was incorporated in 1982 in California, and re-incorporated in Nevada on January 2, 2008.  Franklin's principal offices are located in San Diego, from which the Company's marketing communications, product planning, product management, customer support, sales, and development business activities are conducted on a worldwide basis.

22.    The Company claims to market and sell its products "primarily to wireless operators located in the United States" principally through its "internal direct sales organization and, to a lesser degree, indirectly through strategic partners and distributors."

23.    For the fiscal year ended June 30, 2020, the Company generated $75,072,298 in net sales, of which $74,839,778 came from sales in the United States, and $232,520 came from sales in Asia.

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:21-cv-00687-AJB-MSB

24. For the fiscal year ended June 30, 2020, the majority of Franklin's products were manufactured by two independent companies located in Asia.

25. During the Class Period, Franklin's largest customer was Verizon Communications, Inc. ("Verizon").

### 2. Franklin's Supply Contract with Verizon for Ellipsis Jetpacks

26. During the Class Period, Franklin supplied Verizon with certain malfunctioning 5G/4G LTE Wi-Fi Mobile Hotspots, labelled as Ellipsis Jetpacks (the "Hotspots" or "Ellipsis Jetpacks"), which the Company describes as "[p]ortable Wi-Fi hotspot routers that provide wireless Internet access with 5G/4G support for multiple simultaneously connected devices including laptops, tablets, and smart phones." The Company claims that its Jetpacks "help remote workers be productive while on the go and help students and educational institutions support remote learning activities."

### B. The Jetpacks' Batteries Were Dangerously Defective

27. The Jetpacks were equipped with a standard lithium-ion, or Li-ION, battery, bearing Model Name V604454AR. The battery measures 55.90 x 43.90 x 6.40 millimeters.

28. The lithium-ion batteries in the Jetpacks were defective because they were prone to overheat rapidly and without warning to the end-user. This overheating would cause the battery to leak, spark, catch fire, burn, explode, or otherwise combust, and could cause serious injury.

29. Given the danger that defective lithium-ion batteries present to consumers and the public, lithium-ion batteries are listed as a "Class 9" hazardous material, and specific procedures for packaging, transporting, and recycling lithium-ion batteries while in transit are set forth in 49 C.F.R. § 173.185. Myriad other safety standards exist that are designed to reduce fire hazards associated with the use of lithium-ion batteries to power electronic products. Such standards are developed by Underwriters Laboratories ("UL"), the PCS Type Certification Review Board (the "PTCRB"), the

Global Certification Forum (the "GCF"), and the Third Generation Partnership Project (the "3GPP").

30.     Franklin never tested its V604454AR lithium-ion battery for compliance with the relevant UL standards, nor did Franklin ever seek certification of its V604454AR lithium-ion battery from the PTCRB, GCF, or 3GPP.

## C.     Franklin's Revenue from the Sale of its Jetpacks to a Limited Set of Customers Was Material to Franklin's Overall Business and Viability

31.     Throughout the Class Period, Franklin repeatedly stated that "[r]evenue for sales of products and services is derived from contracts with customers.  The products and services promised in contracts primarily consist of hot spot routers," and that "[m]ost of our revenue recognized at a point in time is for the sale of hot-spot router products."

32.     Moreover, only two of Franklin's customers, Verizon and Sprint, accounted for nearly all of Franklin's revenue, making each such customer critical to the success of Franklin's business.  In Franklin's 2020 10-K, Franklin stated that "[a] significant portion of our revenue is derived from a small number of customers.  For the year ended June 30, 2020, net sales to our two largest customers represented 46% and 36% of our consolidated net sales, respectively, and 21% and 72% of our accounts receivable balance as of June 30, 2020."

33.     In fiscal year 2020, 82% of the Company's consolidated net sales, and 93% of the Company's accounts receivable balance, was from the sale of Jetpacks pursuant to its contracts with Verizon and Sprint.

## D.     Scienter—The Company Was Fully Aware that the Jetpacks Were Prone to Overheat and Catch Fire, But Never Disclosed These Known Risks to Investors

34.     Multiple confidential witnesses confirm that Defendants were fully aware of the overheating dangers the Jetpack devices were experiencing.

### 1.   Confidential Witness 1 ("CW1")[2]

35.   CW1, the former CFO of the company, has expressly stated that Defendants knew "all about the overheating issues" by 2019 and did "not care."

36.   CW1 is a former Director of Finance for Franklin.  She held that role from June 2018 until she resigned in September 2019.  In that capacity, CW1 served as the Chief Financial Officer ("CFO"), following the resignation of former CFO Rick Walker in April 2018.

37.   During her tenure as Director of Finance, CW1 was "second in command" at the Company, working from the Company's San Diego headquarters, and reporting directly to Kim.

38.   CW1 was one of three Franklin employees who reported directly to Kim. The others were David Lee, the Company's Chief Operating Officer ("COO") and Charlie Chu, the Company's Director of Engineering.  Although CW1, Lee, and Chu interacted and met with Kim regularly, Kim was the ultimate decisionmaker at Franklin.

### a.   Complaints from Customers Began in 2018

39.   According to CW1, there were "ongoing problems" with the lithium-ion batteries in the Jetpacks from as early as mid-2018, when CW1 joined Franklin.

40.   CW1 was one of few employees at the Company's headquarters who spoke English, and thus CW1 frequently fielded complaints from carriers.  CW1 relayed the "tons of complaints" to Kim, who did not seem to care about the complaints because the carriers paid for the devices upfront.  CW1 said that she "was always fighting with" the customers, because "Franklin would collect money on the front end, then when 5% malfunction, [Kim] would try to get out of paying them what they're due."

41.   According to CW1, Kim was constantly cutting corners to save money. Specifically, on several occasions, Kim tried to circumvent established FCC compliance protocols to save money.  Kim refused to use the costly test houses most manufacturers

---

[2] All pronouns used to describe confidential witnesses are feminine and may not reflect the genders of the confidential witnesses.

rely on for FCC compliance, and the Company also did not rely on multiple test houses, contrary to the industry norm.  CW1 said that Franklin "did half-ass testing because it's very expensive to get fully FCC complaint."

42.    The Company guaranteed that carriers who bought the Jetpacks upfront would see 2% or fewer returned.  According to CW1, a standard recall rate in the industry is 2%, and this rate was stipulated in contracts with customers like Verizon, who purchased bulk quantities of the Jetpacks from Franklin.  The contracts provided that if a customer was ever required to recall more than 2% of the Jetpacks, Franklin was to issue the customer a refund.  Franklin's recall rate on the Jetpacks was more than double that allotted.  When the carriers returned as many as 5% of the Jetpacks due to malfunctions, Kim was uncooperative about offering cash back.  Indeed, Kim always tried to get out of paying the carriers for the excessive number of recalls.  Kim did not care about refunding carriers due to defective devices.

### b.    Defendants Were Well Aware of the Jetpack Overheating Issues by 2019

43.    According to CW1, Kim and the Company were well aware by 2019 that the Jetpacks overheated, even under normal use, due to the cheap components, including batteries.  Kim knew "all about the overheating issues" and did "not care," according to CW1.  According to CW1, CW1, Lee, and Chu discussed the issues with the Jetpacks with Kim regularly.

44.    Even though CW1 told Kim repeatedly that the Jetpacks were "pieces of crap," Kim did not care to improve them, even if that compromised the Jetpacks' quality and potentially endangered customers.

### c.    Recall Process:  Verizon

45.    According to CW1, Franklin's recall process involved the customer collecting the malfunctioning Jetpacks from end-users.  Verizon had a dedicated point-person who was responsible for collecting, sending, and receiving the defective Jetpacks.  Verizon then sent the Jetpacks to Franklin to diagnose and repair the Jetpacks.

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:21-cv-00687-AJB-MSB

Franklin, however, did not actually repair the devices before sending them back to Verizon.

46.    As CW1 explains, "Verizon sent them back, and Franklin would fiddle with them and send them back to Verizon," explaining that "Franklin would claim they fixed issues and send stuff back" with the same problems that had prompted the initial return.  Franklin represented that it had repaired the defective Jetpacks when, in fact, it had not.  In turn, Verizon would send the same defective Jetpacks back to Franklin time and again and the process would repeat.  That is, Franklin "would receive the same devices back numerous times."

47.    CW1 explained that "[t]he issue with the bat[terie]s was ongoing the entire time I worked there," *i.e.*, from June 2018 through September 2019.

48.    CW1 fielded several complaints about the Jetpacks' overheating issues from Verizon during her tenure, and stated that everyone at Franklin, including Kim, was well aware of the batteries' issues long before Verizon and the USPSC announced the recall on April 8, 2021.

49.    Between June 2018 and September 2019, Franklin received a constant flow of Jetpacks with battery issues from Verizon.

### 2.    Confidential Witness 2 ("CW2")

50.    Statements by CW2 make clear that Defendant Kim personally requested reports detailing incidents in which Jetpack batteries "burned," and so was well aware of this problem by 2019.

51.    CW2 is a former Director of New Business Development for Franklin.  She held that role from May 2019 until she resigned in October 2020.  In that capacity, CW2 was accountable for Franklin's 5G and Internet of Things ("IoT") business development.  CW2's product portfolio included the Jetpacks at issue, and CW2 worked with Verizon and other carriers in preparation for the launch of new Franklin products.  CW2 worked from the Company's San Diego headquarters.  CW2 prepared investigative reports for Kim and at Kim's direct request during CW2's tenure.

52.     CW2 recalls at least multiple incidents of the Jetpacks overheating and catching fire as a result of "the battery burning," and wrote reports for Kim at Kim's direct request explaining these incidents and detailing what happened "where the battery burned."   In Fall 2019, Verizon returned a Jetpack to Franklin after the battery overheated and the device was burnt.   Kim "demanded a report" from CW2, which CW2 wrote and then sent to Kim.   The Fall 2019 report explained that there was a problem with the batteries in the Jetpack devices that made the devices overheat.   CW2 explained that she wrote several similar reports for Kim between May 2019 and October 2020 because there were "a few cases like that."

53.     Notwithstanding that Franklin knew that Jetpacks had a tendency to overheat and combust, Franklin maintained a "default return procedure" specifically for the Jetpacks, whereby Verizon would return defective Jetpacks to Franklin, and Franklin would then refurbish the devices.   Franklin then either returned the refurbished Jetpack to Verizon, or would sell the refurbished device to another customer.

### 3.     Confidential Witness 3 ("CW3")

54.     Statements by CW3 show that the Company was well aware that the Jetpacks were not intended for the use for which they were being sold—daily use in schools and businesses—and that the batteries were likely to overheat after a year of such use.

55.     CW3 is a former Senior Director and Vice President of Engineering and Product Development for Franklin.   She worked from the Company's San Diego headquarters and held that role from June 2004 until she resigned in December 2017.   In that capacity, CW3 directed all phases of wireless product programs, including product design, development, technical approval testing, marketing, product certification, and product delivery.   CW3 reviewed and updated new business plans and project pipeline development and responded to requests for information ("RFIs") and requests for proposals ("RFPs") for wireless data services.   CW3 researched and initiated advanced technology and new business development opportunities, and was responsible for

delivering the Mobile Hotspot projects at Franklin, including the at-issue Jetpacks. CW3 managed the Company's relationships with major U.S. carriers, including Verizon and Sprint, and worked with the carriers to establish product requirements and to complete the certification and approval processes.

56.     According to CW3, Jetpacks were not designed for round-the-clock use, nor were they designed to serve as a hotspot for an entire household of users.  Instead, the Jetpacks were designed for a "niche market;" that is, for use by professionals or students for only a couple of hours per day while away from home, as "a hotspot for a mobile user, enjoying their Wi-Fi hotspot" while away from home.  CW3 explained that Jetpacks are "devices for mobile use," and a Jetpack is not "a 24-hour use device."

57.     According to CW3, overheating issues are typical of the battery that was included in the Jetpacks, and the problems the Jetpacks encountered were "normal after more than one year of use."  Heavy, round-the-clock use by multiple users causes the batteries to overheat and explode.   "This is not an industry with military-grade batteries," said CW3.

### 4.     Confidential Witness 4 ("CW4")

58.     Information from CW4 makes clear that defective devices were routinely returned to Franklin, such that Franklin would have received and been in possession of burned devices.

59.     CW4 is a former Reverse Logistics Associate for Franklin.  She held that role from September 2017 until her resignation in December 2017.  In that capacity, CW4 was responsible for receiving, repairing, refurbishing, and refinishing the defective devices that Franklin received from Verizon, Sprint, and T-Mobile, and for shipping these "refinished" devices back to the customer.  CW4 received several Jetpacks that Verizon returned to Franklin, and repaired, refurbished, and refinished them, and then shipped these "refurbished" devices to Verizon.

60.     According to CW4, Franklin "repaired" defective Jetpacks by cleaning connections and battery terminals, diagnosing software problems, and re-flashing

software.   After she made the devices look nice, CW4 shipped the devices back to Verizon.

61.     Customers referred to CW4 as a "Direct Return Specialist Representative," and her duties also included communicating directly with her counterparts at Verizon, Sprint, and T-Mobile.

62.     When Franklin received a defective Jetpack from Verizon, CW4 told customers that Franklin would replace the defective Jetpack with an entirely new device, pursuant to the Company's contract with Verizon.   In fact, for most devices, CW4 usually only repaired, cleaned, or reset the unit's software and sent it back to Verizon.   Specifically, CW4 would "wipe off" the Jetpacks, reset the Jetpack's battery power management settings, and then repackage the defective Jetpack and ship it back to Verizon.

63.     According to CW4, Franklin maintained a device inventory and kept track of which Jetpacks were returned, the reasons for the return, and the resolution of each return.   Franklin was able to analyze the data to identify trends from the problems that were occurring regularly, including the battery issues with the Jetpacks.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.     September 17, 2020 Annual Report

64.     On September 17, 2020, the Company filed its Annual Report on SEC Form 10-K for the fiscal year ended June 30, 2020 (the "2020 10-K").[3]

65.     In the 2020 10-K, Franklin stated:

WE OPERATE IN A FIELD WITH RAPIDLY CHANGING TECHNOLOGY.   We cannot be certain that our products and services will function as anticipated or be desirable to our intended markets.   *Our current or future products and services may fail to function properly*, and if our products and services do not achieve and sustain market acceptance, our business, results of operations and profitability may suffer.

---

[3] On September 18, 2020, the Company filed an amendment to the 2020 10-K to include an exhibit titled "Description of Securities," which had been omitted from the original filing.  The 2020 10-K was not otherwise modified by the amendment.

AMENDED CLASS ACTION COMPLAINT:  Case No. 3:21-cv-00687-AJB-MSB

(Emphasis added).

66.    The statements in ¶ 65 were materially false and misleading because in stating that its *"current or future products and services may fail to function properly*,*"* Defendants implied that their current products were not currently failing to function properly.  In fact, Defendants knew that their core product, the Jetpacks, that Franklin sold to its customers from as early as April 2017 through September 17, 2020, had defective batteries that caused the devices to overheat and catch fire.

67.    In the 2020 10-K, Franklin also stated:

> THE LOSS OF ANY OF OUR MATERIAL CUSTOMERS COULD ADVERSELY AFFECT OUR REVENUES AND PROFITABILITY, AND THEREFORE SHAREHOLDER VALUE.  We depend on a small number of customers for a significant portion of our revenues.  For the year ended June 30, 2020, net revenues from our two largest customers represented 46% and 36% of our consolidated net sales, respectively.  We have a written agreement with each of these customers that governs the sale of products to them, but the agreements do not obligate them to purchase any quantity of products from us.  If these customers were to reduce their business with us, our revenues and profitability could materially decline.

68.    The statements in ¶ 67 were materially false and misleading because Defendants knew but failed to disclose material, adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants knew or were severely reckless in not knowing that the Company's customers would recall the Ellipsis Jetpacks due to the defective batteries that Defendants knew or were severely reckless in not knowing could cause the devices to overheat and pose a fire hazard as a result, yet Defendants failed to disclose these facts in discussing the risk of loss of customers.

69.    In the 2020 10-K, Franklin was also required under 17 CFR § 229.303 to describe "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  The problems with the Jetpacks, including their overheating batteries, were reasonably likely to have a material unfavorable impact on

Franklin's net sales or revenues or income from continuing operations because those problems made it likely that Franklin would sell fewer of those devices or suffer recalls of the devices. Franklin therefore had an obligation to disclose the problems with the Jetpacks to investors, and misled investors by failing to make that disclosure.

**B.    November 16, 2020 Quarterly Report**

70.    On November 16, 2020, Franklin filed its quarterly report on Form 10-Q for the period ended September 30, 2020 (the "1Q21 10-Q"). Franklin incorporated by reference the risk factors stated in its 2020 10-K.

71.    Franklin's statements in its 1Q21 10-Q were materially false and misleading for the same reasons those statements were misleading in its 2020 10-K.

**C.    February 16, 2021 Quarterly Report**

72.    On February 16, 2021, the Company filed its quarterly report on Form 10-Q for the period ended December 31, 2020 (the "2Q21 10-Q"). Franklin incorporated by reference the risk factors stated in its 2020 10-K.

73.    Franklin's statements in its 2Q21 10-Q were materially false and misleading for the same reasons those statements were misleading in its 2020 10-K.

## VI.    LOSS CAUSATION

**A.    April 1, 2021**

74.    On April 1, 2021, Franklin stated that it "ha[d] been notified of reports of battery issues in some of its wireless hotspot devices," and stated that "[t]he [C]ompany is working with its battery and device manufacturing partners and carrier customer to determine the cause and extent of the problem."[4]

75.    On this news, the price of Franklin's shares fell by $0.35 per share, or 1.65%, to close at $20.77 per share on April 5, 2021, the next trading session, on unusually heavy trading volume.

---

[4] Franklin Wireless Corp., *Franklin Wireless Investigating Battery Issues* (Globe Newswire Apr. 1, 2021).

### B.   April 8, 2021

76.   On April 8, 2021, CNBC reported that Franklin's customer, Verizon, was "recalling 2.5 million" "Ellipsis Jetpack mobile hotspots imported by Franklin Wireless Corp and sold between April 2017 and March 2021" and that "[t]he affected models are labeled:  MHS900L, MHS900LS and MHS900LPP," "after discovering that the lithium ion battery can overheat, creating a fire and burning hazard."[5] According to CNBC, "just over 1 million of the recalled devices are currently in use, meaning currently or recently used by customers."[6]  According to CNBC, "Verizon had received 15 reports of the hotspots overheating.  Six of those reports included incidents of fire damage to bedding or flooring and two involved minor burn injuries," and that "[s]ome of the hotspots were supplied to students by their schools to continue remote learning."[7]

77.   Also on April 8, 2021, the United States Consumer Product Safety Commission ("USCPSC") issued Recall Number 21-106 and published a notice of Verizon's recall of Franklin's "Ellipsis Jetpack mobile hotspots," identifying that "[t]he lithium ion battery in the hotspots can overheat, posing fire and burn hazards."[8] According to the USCPSC, "Verizon has received 15 reports of the hotspots overheating, including six reports of fire damage to bedding or flooring and two reports of minor burn injuries."[9]  According to the USCPSC, the devices were manufactured in "Vietnam and Taiwan" and were sold at "Verizon stores nationwide, and other stores and to school districts nationwide and online at www.verizon.com from April 2017 through march 2021 for between $50 to $150."[10]  Consumers were directed to contact

---

[5] Lauren Feiner, *Verizon Recalls 2.5 Million Hotspot Devices Due to Fire Hazard* (CNBC Apr. 8, 2021 3:05PM EDT),
https://www.cnbc.com/2021/04/08/verizon-recalls-2point5-million-hotspot-devices-due-to-fire-hazard.html.

[6] *Id.*

[7] *Id.*

[8] U.S. Consumer Product Safety Comm'n, *Verizon Recalls 2.5 Million Ellipsis Jetpack Mobile Hotspots Imported by Franklin Wireless Due to Fire and Burn Hazards* (Apr. 8, 2021).

[9] *Id.*

[10] *Id.*

Verizon "to receive a replacement hotspot free of charge" and to "return the Ellipsis to Verizon for safe disposal."[11]   Additionally, the USCPSC advised that "[s]chools that provided the recalled Ellipsis Jetpack to students have been contacted by Verizon with instructions on receiving replacement hotspots free of charge and mailing packages to return the recalled Ellipsis Jetpacks to Verizon for safe disposal," and advised "[p]arents whose children received the recalled Ellipsis Jetpack from their schools" to "contact their school for instructions on how to receive a free replacement device and return their recalled Ellipsis Jetpacks."[12]

78.   On this news, the price of Franklin's shares fell by $2.82 per share, or 14%, to close at $17.33 per share on April 8, 2021, on unusually heavy trading volume.

## C.   April 9, 2021

79.   On April 9, 2021, Franklin stated that its customer, Verizon, "has issued a voluntary recall of its Jetpack Hotspot devices imported by Franklin," adding that "Franklin is continuing to work with its battery and device manufacturing partners to determine the cause and extent of the concerns."[13]   The Company added that "[a]t this time, fewer than 20 reports of trouble have been received with over 2 million devices in [*sic*] sold over the last three and a half years."[14]

80.   On this news, the price of Franklin's shares fell by $4.07 per share, or nearly 23%, to close at $13.26 per share on April 9, 2021, on unusually heavy trading volume.

## VII.   CLASS ACTION ALLEGATIONS

81.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Franklin securities in the United States during the

---

[11] *Id.*

[12] *Id.*

[13] Franklin Wireless Corp., *Franklin Wireless Responds to Verizon Jetpack Recall* (Globe Newswire Apr. 9, 2021 9:00AM EDT).

[14] *Id.*

Class Period and who were damaged upon the revelation of the alleged corrective disclosures (the "Class").

82.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Franklin securities were actively traded on the NASDAQ.  While the exact number of Class Members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Franklin, its transfer agent, or its domestic depositary, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

83.   Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

84.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

85.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether applicable securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Franklin;

(c)   whether the Individual Defendants caused Franklin to issue false and misleading statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading statements; and

(e)     whether the members of the Class have sustained damages and, if so, what the proper measure of damages is.

86.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

87.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine.

88.     The markets for Franklin's securities were open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Franklin's securities traded at artificially inflated prices during the Class Period.  On September 21, 2018, the Company's securities on the NASDAQ closed at a Class Period high of $23.00.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Franklin's securities and market information relating to Franklin and have been damaged thereby.

89.     During the Class Period, the artificial inflation of Franklin's securities was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Lead Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Franklin's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Franklin and its business, operations, and prospects, thus causing the price of the Company's securities to be

artificially inflated and maintained at artificially inflated levels at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements during the Class Period induced and resulted in purchases, by Lead Plaintiff and members of the Class, of the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

90.    At all relevant times, the markets for Franklin's securities were efficient markets for the following reasons, among others:

(a)    Franklin's securities met the requirements for listing, and were listed and actively traded, on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Franklin filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Franklin regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Franklin was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

91.    As a result of the foregoing, the market for Franklin's securities promptly digested current information regarding Franklin from all publicly available sources and reflected such information in the price of Franklin's securities.  Under these circumstances, all purchasers of Franklin's securities during the Class Period suffered similar injury through their purchase of Franklin's securities at artificially inflated prices, and a presumption of reliance applies.

92.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims center, in large part, upon Defendants' material omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated by law to disclose—positive proof of reliance is not a prerequisite to recovery.

## VIII.     NO SAFE HARBOR

93.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Amended Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   Additionally, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified specifically as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

94.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each such statement was made, the speaker had actual knowledge, or recklessly disregarded the risk, that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Franklin who knew, or recklessly disregarded the risk, that the statement was false when made.

## IX.     COUNT ONE

### For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 (Against All Defendants)

95.     Lead Plaintiff repeats, realleges, and incorporates by reference every allegation pleaded above as if fully set forth herein.

96.     Throughout the Class Period, Franklin's securities were listed and actively traded on the NASDAQ, a free, open, and efficient securities market.

97.     During the Class Period, Defendants made, disseminated, or approved the false and misleading statements specified above.  The Defendants knew that such statements, when made, were false and misleading, or were reckless in their disregard as to the truth of such statements, which contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.     The Defendants violated Section 10(b) of the '34 Act, *codified as amended*, 15 U.S.C. § 78j(b) and SEC Rule 10b–5, *codified as amended*, 17 C.F.R. § 240.10b–5, because, in utilizing the means or instrumentalities of interstate commerce, including but not limited to the mails and the Internet, and/or the facilities of the NASDAQ, they directly or indirectly:

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and the members of the Class in connection with their purchases of Franklin securities during the Class Period.

99.     Lead Plaintiff and members of the Class have suffered damages in that, in reliance on the Defendants' statements and the integrity of the market, they paid artificially inflated prices for Franklin's securities.  Lead Plaintiff and members of the Class would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of Franklin's securities had been artificially and falsely inflated by the Defendants' false and misleading statements.

100. As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and members of the Class suffered damages in connection with their purchases of Franklin's securities on the NASDAQ during the Class Period.

## X.    COUNT TWO

### For Violations of Section 20(a) of the Securities Exchange Act of 1934
### (Against the Individual Defendants)

101. Lead Plaintiff repeats, realleges, and incorporates by reference every allegation pleaded above as if fully set forth herein.

102. Throughout the Class Period, Franklin's securities were listed and actively traded on the NASDAQ, a free, open, and efficient securities market.

103. As alleged herein, the Individual Defendants acted as controlling persons of Franklin within the meaning of Section 20(a) of the '34 Act *codified as amended*, 15 U.S.C. § 78t(a). By virtue of their high-level positions, ownership rights, contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104. In particular, each of these Individual Defendants had direct and supervisory involvement in the quotidian operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

105. As set forth above, the Defendants each violated Section 10(b) of the '34 Act and SEC Rule 10b–5 by their acts and/or omissions as alleged in this Amended

Complaint.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of said Act.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities traded on the NASDAQ during the Class Period.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in investigating, bringing, and maintaining this action, including counsel fees and expert fees; and

D.     Awarding such other and further legal or equitable relief as the Court deems just and proper.

## XII.   JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all issues so triable in this Action.

Dated:  November 15, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Austin Van*
Jeremy A. Lieberman (*pro hac vice*)
Austin P. Van (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
avan@pomlaw.com

Jennifer Pafiti
1100 Glendon Avenue, 15th Floor
Los Angeles, California  90024
Telephone:  (310) 405-7190
Facsimile:  (917) 463-1044
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiff*

Lesley F. Portnoy
THE PORTNOY LAW FIRM
1800 Century Park East, Suite 600
Los Angeles, California   90067
Telephone:  (310) 692-8883
Facsimile:  (212) 697-7296
lesley@portnoylaw.com

*Additional Counsel for Lead Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Terrence W. Scudieri, Jr., hereby certify that a true and correct duplicate copy of the foregoing Amended Class Action Complaint for Violations of the Federal Securities Laws was filed electronically on November 15, 2021. Parties may access this filing through the Court's CM/ECF system.

I further certify that on November 15, 2021, a copy of the foregoing Amended Class Action Complaint for Violations of the Federal Securities Laws was served upon the below-named individual by electronic mail and by FedEx overnight:

SML Avvocati P.C.
Stephen M. Lobbin, Esq.
888 Prospect Street, Suite 200
La Jolla, California  92037
Telephone:  (949) 636.1391
Email:       sml@smlavvocati.com

*Attorney for Defendants*

_____ */s/ Terrence W. Scudieri, Jr.* _____