# Exhibit F

**1**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOHAMMED USMAN ALI, Individually and On Behalf of All Others Similarly Situated, | Case No. 3:21-CV-00687-AJB-MSB |
| Plaintiff, | Judge Hon. Anthony J. Battaglia |
| v. | |
| FRANKLIN WIRELESS CORP., OC KIM, and DAVID BROWN, | |
| Defendants. | |

## EXPERT REPORT OF SORIN SORESCU, PH.D.

**July 22, 2022**

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

## Table of Contents

1   Introduction ........................................................................................................... 3
  1.1   Qualifications ................................................................................................. 3
  1.2   Summary of Opinions ..................................................................................... 3
2   Case Background ................................................................................................... 4
  2.1   Overview of the Company and Allegations ..................................................... 4
  2.2   Bases for Opinions on Market Efficiency ....................................................... 5
3   Analysis of the Indirect Factors for Market Efficiency ......................................... 8
  3.1   Average Weekly Trading Volume ................................................................... 8
  3.2   Analyst Coverage ........................................................................................... 9
  3.3   Market Makers and Arbitrageurs ...................................................................11
    3.3.1   Trading on the NASDAQ ........................................................................11
    3.3.2   Institutional Ownership.......................................................................... 13
  3.4   SEC Form S-3 Filing Eligibility .................................................................. 14
  3.5   Market Capitalization.................................................................................... 15
  3.6   Bid-Ask Spread ............................................................................................ 16
  3.7   Public Float .................................................................................................. 17
4   Analysis of the Direct Factors for Market Efficiency........................................... 18
  4.1   Cause and Effect Relationship Between Company Information and Stock Prices ....... 18
  4.2   Autocorrelation ............................................................................................ 23
5   Ability to Calculate Damages on a Class-Wide Basis .......................................... 24
6   Conclusion .......................................................................................................... 26
Appendix A ................................................................................................................ 28
Appendix B ................................................................................................................ 40
Exhibit 1.................................................................................................................... 43
Exhibit 2.................................................................................................................... 44
Exhibit 3.................................................................................................................... 45
Exhibit 4.................................................................................................................... 46
Exhibit 5.................................................................................................................... 47
Exhibit 6.................................................................................................................... 48
Exhibit 7.................................................................................................................... 49
Exhibit 8.................................................................................................................... 50
Exhibit 9.................................................................................................................... 51
Exhibit 10................................................................................................................... 52
Exhibit 11 .................................................................................................................. 53
Exhibit 12................................................................................................................... 54

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

# 1   INTRODUCTION

## 1.1   Qualifications

1.   I am a Professor of Finance and the holder of the *Foreman R. and Ruby Bennett Chair in Business Administration* at Mays Business School, Texas A&M University. I currently also serve as the school's Executive Associate Dean. I teach courses, participate in academic seminars, and conduct research in various areas related to finance, marketing, and economics. My research focuses on studying the efficiency of the stock market, over- and under-valuation of publicly traded securities, predictability in stock returns, as well as informational content of security prices. I have published 16 articles in peer-reviewed academic journals, 12 of which appear in top business journals (*Journal of Finance*, *Journal of Financial Economics*, *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis, Journal of Marketing,* and *Marketing Science*).

2.   Prior to joining Mays Business School in 2002, I was an Assistant Professor of Finance at the Bauer College of Business, University of Houston. During this time, I taught topics at the undergraduate, M.S. MBA, EMBA and Ph.D. levels, including corporate finance, financial markets, and investments analysis. I also conducted empirical research on various financial and economic topics. Since 1996 I have been engaged in academic research and continue to produce research that is targeted to top academic journals in these areas.

3.   Prior to working at the Bauer College of Business, I received a Ph.D. in Finance from the University of Florida in 1996. Prior to those studies, I worked as a research assistant at the University of Florida and as a teaching assistant at McGill University. I received an M.B.A. from McGill University in 1991 and a Bachelors in Engineering from McGill University in 1989.

4.   In addition to teaching at Texas A&M University, University of Florida and University of Houston, I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

## 1.2   Summary of Opinions

5.   I have been asked by the Court-appointed Counsel for Plaintiff in this matter to determine whether the market for Franklin Wireless Corporation ("Franklin Wireless" or the "Company") common stock ("Common Stock") was efficient during the period September 17, 2020 – April 8,

Case 3:21-cv-00687-AJB-MSB Document 193-6 Filed 07/22/24 PageID.1727 Page 5 of 55

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

2021 inclusive (the "Class Period").[1,2] In addition, I have been asked to opine on whether the calculation of damages on a class-wide basis in this matter is subject to a common methodology.

6. The materials I have considered in forming my opinions are summarized in **Appendix B**. My time is billed at a rate of $650 per hour for my work on this matter. I am being assisted by staff at Fideres Partners LLP who performed work under my direction. My compensation is in no way contingent on the outcome of this case. My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention. I have no financial or other interest in Fideres Partners other than the billings in this matter.

7. Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for shares of Franklin Wireless's Common Stock was efficient during the Class Period.

8. I have also formed the opinion that damages in this matter can be calculated on a class-wide basis subject to a common methodology

9. The remainder of my report is organized as follows: **Section 2** describes the case background and the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section 3 and 4** presents my analyses of the market efficiency factors during the Class Period. **Section 5** addresses how damages can be calculated on a class-wide basis subject to a common methodology. **Section 6** contains my conclusions.

## 2 CASE BACKGROUND

### 2.1 Overview of the Company and Allegations

10. Franklin Wireless is a developer of hardware and software with a focus on machine-to-

---

[1] Counsel for the Plaintiff is Pomerantz LLP.

[2] I understand the Lead Plaintiff to be the Gergely Csaba, and Defendants to comprise Franklin Wireless Corporation., OC Kim, David Brown, collectively the "Defendants". Source: Amended Class Action Complaint for Violations if the Federal Securities Laws, *MOHAMMED USMAL ALI, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. FRANKLIN WIRELESS CORP., OC KIM, and DAVID BROWN, Defendants,* No. 3:21-CV-00687-AJB-MSB (the "Complaint").

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

machine applications and wireless optimization devices. The company mainly distributes embedded modules, modems, and gateways directly to wireless operators and indirectly through strategic partners and distributors to support a broad spectrum of applications based on 4G and 5G wireless technology.

11.  The complaint alleges that from September 17, 2020 to April 8, 2021, the Class Period, Franklin Wireless misled investors by knowingly selling defective mobile hotspot devices ("Ellipsis Jetpacks" or "Jetpacks" or "Hotspots") to customers, including 2.5 million to its largest customer, Verizon Wireless, Inc. ("Verizon"). Most of these devices ultimately were sold or leased by Verizon to school districts for use by school-aged children in the United States. The complaint also alleges that Franklin knew, but did not disclose, that these devices were manufactured with defective lithium-ion batteries that could potentially overheat or catch fire. Executives at Franklin had an obligation to disclose the defective nature of the company's products but failed to do so to avoid a resultant drop in value. Franklin submitted SEC filings which directly implied that its devices were not suffering from any noteworthy failures.[3] Additionally, defendant Kim, the CEO of Franklin, personally commissioned investigations of the burned devices as early 2019. Only on April 9, 2021, the day after Verizon announced it would no longer be selling the products in question, did Franklin Wireless disclose that the devices were defective and had caused injury on at least 15 occasions. Due to the untimely delivery of Franklin's disclosure regarding the hazardous nature of their products, investors allegedly purchased Franklin Wireless Common Stock at an artificially inflated price during the Class Period.

12.  **Exhibit 1** graphs the closing stock price and trading volume for Franklin Wireless's Common Stock shares throughout the Class Period.

## 2.2    Bases for Opinions on Market Efficiency

13.  In financial literature, the term "efficient market" is used to describe a marketplace in which all stocks are fairly priced, meaning their market value does not diverge greatly from their fundamental value, which is the risk-adjusted sum of their future cash flows. In such a market,

---

[3] Specifically, on September 17, 2020, Franklin filed the annual 10-K report with the Securities and Exchange Commission in which they failed to disclose problems with their mobile hotspot devices, which had been known to the defendants since 2019. Subsequently, on November 16, 2020 and February 16, 2021, Franklin filed its quarterly 10-Q reports with the SEC, also failing to disclose problems with their mobile hotspot devices.

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

publicly available information is quickly incorporated into stock price movements as investors can immediately assimilate disclosures into their investment strategies. Under the "fraud-on-the-market" theory that Plaintiff has asserted, investors can rely on a price reflecting all publicly available information and are therefore reliant on a company's material misrepresentations and omissions. In an efficient market, all purchasers of the stock are induced into reliance on any misrepresentations or omissions because those statements or omissions have distorted the value of each class member's purchase price.

14. Consequently, a company's failure to disclose relevant information or provision of misleading information to shareholders will lead to the stock price becoming distorted and either inflated or deflated relative to the price at which the stock would trade, absent such misleading or omitted information. Thus, in an efficient market, purchasers implicitly rely on all of a company's disclosures as well as misrepresentations and omissions as this information is impounded into the price at which the company's stock trades.

15. An efficient market is one in which anyone can buy or sell securities, has a high level of trading activity, and can absorb a reasonable amount of trade volume with low trade costs. In past cases, practitioners have argued and Courts have established that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, are presumed to be efficient for securities traded on them.[4] While the market value of certain stocks can temporarily deviate from fundamental value, such deviations are short lived, often unpredictable, and quickly corrected. For stocks that trade on a well-established market, the continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other exchange rules create conditions that are consistent with the existence of efficient markets. Because Franklin Wireless's Common Stock traded in such a well-developed market (on the OTC NASDAQ until March 29, 2021, when it started trading on CM NASDAQ under the trading symbol "FKWL") we can assume a strong presumption of market efficiency.

16. Many academic studies have empirically validated the hypothesis of market efficiency.

---

[4] See Cammer v. Bloom, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("Cammer"), citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

Additionally, while some research has identified anomalies that call into question the efficiency of markets, these anomalies have been generally accepted as random patterns in the data, are often not scientifically reproducible or robust to different statistical modeling choices, and/or are not persistent and have been eliminated by arbitrage trading. Therefore, these anomalies do not represent consistent behavior of the overall market. For example, Nobel prize winner Eugene Fama summarizes the evidence in favor of market efficiency as follows:

> *The recent finance literature seems to produce many long-term return anomalies. Subjected to scrutiny, however, the evidence does not suggest that market efficiency should be abandoned. Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction of stock prices to information is about as common as underreaction. And post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal. Most important, the long-term return anomalies are fragile. They tend to disappear with reasonable changes in the way they are measured.[5]*

17. Similarly, my own work shows that stock prices fairly reflect public information conveyed by a firm's dividend policy, or information related to the quality of a firm's corporate governance.[6]

18. Kewei Hou, Chen Xue, and Lu Zhang conclude that "[m]ost anomalies fail to replicate, falling short of the currently acceptable standards for empirical finance…In all, capital markets are more efficient than previously recognized."[7]

19. Beyond academic research, courts have also developed various tests that attempt to weigh in favor of, or against the presumption of market efficiency. While no single factor is determinative of market efficiency, when viewed as a whole they can be informative in supporting or rebutting a presumption of market efficiency in relation to the reliance element of the fraud-on-the-market theory. Courts refer to the basic set of established tests as the Cammer and Krogman factors, and

---

[5] Eugene F. Fama, 1998, Market Efficiency, Long-Term Returns, and Behavioral Finance, Journal of Financial Economics 49, at 304.

[6] See Boehme, Rodney, and Sorin M. Sorescu, 2002, The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?, Journal of Finance, 57 at 871, and Johnson, Shane, Theodore Moorman, and Sorin M. Sorescu, 2009, A Reexamination of Corporate Governance and Equity Prices, Review of Financial Studies, at 4753.

[7] Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, Review of Financial Studies 33, at 2071.

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

have since developed further metrics to establish or rebut the notion of market efficiency.

20.  In this report, I will discuss each of these metrics in greater detail as well as evaluate them in relation to Franklin Wireless Stock. I will also compare the results for each factor for Franklin Wireless against court and academic established benchmarks and relay my findings in terms of scientific tests of statistical significance.

21.  The following section presents my analyses and findings from the evaluation of various market efficiency factors for Franklin Wireless Common Stock during the Class Period.

# 3    ANALYSIS OF THE INDIRECT FACTORS FOR MARKET EFFICIENCY

## 3.1    Average Weekly Trading Volume

22.  Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security. For example, my own work shows that trading volume increases following option introductions contribute to more efficient stock prices.[8] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock. Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[9]

23.  Stock trading volume refers to the extent to which a firm's equity is traded among investors during a given time period. The first Cammer factor for stock trading volume has been defined by the Cammer court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

*Turnover measured by average weekly trading of 2% or more of the outstanding shares would*

---

[8] See Danielsen, Bartley, and Sorin M. Sorescu, 2001, Why do Option Introductions Depress Stock Prices?  An Empirical Study of Diminishing Short Sale Constraints, Journal of Financial and Quantitative Analysis, 36, at 451.

[9] Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, Law and Contemporary Problems 63, at 108.

*justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.*[10]

24. During the Class Period, a total of 2,172,392 million shares of Franklin Wireless Common Stock was traded by investors. **Exhibit 2** graphs Franklin Wireless's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[11] The average weekly trading volume was 1.22% of Franklin Wireless's common shares outstanding over the Class Period. The average weekly turnover for Franklin Wireless Common Stock is larger than the 1% threshold that Cammer held would "justify a substantial presumption that the market for the security is an efficient one." As a result, Franklin Wireless's level of stock trading volume throughout the Class Period supports the conclusion that Franklin Wireless's Common Stock traded in an efficient market throughout the Class Period.

## 3.2 Analyst Coverage

25. Analysts are knowledgeable, financial professionals who study financial information and trends for a specific company or an industry. Analysts typically publish reports in which they may assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock. The content of analyst reports includes information that the analyst believes is important for investors. Because they quickly disseminate recent developments about a covered company to investors through these reports, the analysts' presence means that important information of the company is likely to be reflected in the company's stock price through increased trading activity. The Cammer court similarly stated:

*[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals,*

---

[10] Cammer, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[11] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week. In addition, insider holdings have been removed from shares outstanding.

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

*who would in turn make buy/sell recommendations to client investors.*[12]

26.  **Exhibit 3** displays my findings regarding analyst coverage for Franklin Wireless. Over the course of the class period, I identified 15 analyst reports issued by 8 separate firms.[13] This list includes reports that were produced by firms that conduct thorough and detailed research on Franklin Wireless and its industry, such as CapitalCube, Lake Street Capital Markets, and Vermillion Technical Research. These reports served to disseminate important publicly available information to investors as it was disclosed, including financial performance, forecasts, company news, and analyst commentary and recommendations.

27.  Franklin Wireless's analyst coverage is consistent with the coverage deemed necessary by courts to support an assumption of market efficiency in a number of other cases, namely *In Re Winstar Comm. Sec. Litig., 290 F.R.D. 437, S.D. N.Y. (2013)*. Therefore, due to the number of analyst firms providing coverage as well as the volume of analyst reports generated during the Class Period, the significant analyst coverage Franklin Wireless received supports the conclusion that Franklin Wireless's Common Stock traded in an efficient market throughout the Class Period.

28.  In addition to the analyst reports documented above, there was also a significant amount of media coverage from data providers regarding Franklin Wireless, which investors could access to gain a better understanding of the company's fundamentals. For example, I conducted a search of press and news articles about Franklin Wireless using Factiva (which includes coverage and research reports from BuySellSignals Research, Dow Jones Newswires, Dow Jones Institutional News, The Wall Street Journal, MarketWatch, Reuters, PR Newswires, Investor's Business Daily, and others). This search identified 34 news days throughout the Class Period. Moreover, Franklin Wireless's SEC filings were immediately made available to the public through the SEC's online database, EDGAR, during the Class Period. The significant amount of analyst coverage, substantial and timely dissemination of news to investors, and publicly available SEC filings of Franklin Wireless support the idea that information regarding Franklin Wireless was quickly incorporated into its stock price and therefore support the conclusion that Franklin Wireless

---

[12] Cammer, 711 F. Supp. at 1286.

[13] I obtained analyst reports covering Franklin Wireless from Investext. These statistics represent a lower bound of the analyst coverage of Franklin Wireless because many analyst reports are provided directly to investors but are not captured by third-party data vendors such as Investext.

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

Common Stock traded in a well-developed and informationally efficient market during the Class Period.

## 3.3    Market Makers and Arbitrageurs

### 3.3.1    Trading on the NASDAQ

29.   The third Cammer factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours.[14] Market makers can facilitate market efficiency in an over-the-counter market because they are:

*… [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.*[15]

30.   In evaluating market efficiency by looking at market makers, the Cammer court held:

*For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.*[16]

31.   The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting. Although in the case of Franklin Wireless volume data is indeed available (and the results of my volume tests discussed in **Section 3.1** are consistent with market efficiency), the presence of market makers can strengthen and corroborate the conclusion that a particular stock trades in an

---

[14]  A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." See https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[15]  Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, Journal of Corporate Law 19, at 291.

[16]  Cammer, 711 F. Supp. at 1293.

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

efficient market. In the case of Franklin Wireless, there were at least 25 market makers and brokers providing similar activity during the Class Period.[17] In addition, Franklin Wireless's Common Stock traded on the NASDAQ towards the end of the Class Period. This type of large, national exchange reports volume, prices, bid-ask spreads, and other trading details which ensure that it remains well-developed, liquid, and efficient. The Cammer court thus stated:

> *We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.*[18]

32. I understand that courts view large, established stock exchanges with market makers (such as the NYSE and NASDAQ[19]) as being informationally efficient.[20] Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by

---

[17] Bloomberg "RANK" function.

[18] Cammer, 711 F. Supp. at 1292.

[19] The NYSE Market Model, NYSE, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery." See also: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

[20] See, e.g., Vinh Nguyen v. Radient Pharms. Corp., 287 F.R.D. 563, 572-73 (C.D. Ca. 2012) ("One defendant in Cammer contended that only stocks trading on the New York or American stock exchanges should be eligible for the presumption of reliance provided by the theory of fraud on the market. In rejecting that broad distinction, the court noted that 'the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades.' But the trading location is still important, in one key sense: In an over the counter market, the number of market makers may be a particularly important measure of market efficiency…By contrast, Radient traded on the NYSE Amex during the Class Period which, as Plaintiffs' expert notes, means that it was assigned what that market now calls a Designated Market Maker" (citations omitted). See also Hayes v. MagnaChip Semiconductor Corp., Case No. 14-cv-01160-JST (N.D. Ca. 2016), at 6: "The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency."

---

supplying trading liquidity and informationally-efficient and informed trading.[21] Academic research has similarly found that institutional investors can facilitate trading liquidity. As I discuss below, Franklin Wireless's Common Stock was widely held by institutional investors throughout the Class Period.[22]

### 3.3.2  Institutional Ownership

33.  Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices.[23] Thus, the presence of institutional shareholders can be an indicator of market efficiency.

34.  I also report the total institutional ownership of Franklin Wireless Common Stock in **Exhibit 11**, which shows that at least 25 institutions held the stock at some point during the Class Period.

---

[21] See, e.g., In re Countrywide Financial Corp. Sec. Litig., 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.")

[22] Franklin Wireless Common Stock was held by at least 25 institutional investors at some point during the Class Period (see **Exhibit 11**). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 26.79% of shares outstanding on Q2 2021 to a maximum of 28.64% of shares outstanding on Q1 2021, according to data from S&P Capital IQ and Franklin Wireless's SEC Filings. These figures represent a lower-bound estimate of institutional holdings as some institutions may not be reflected in S&P Capital IQ's coverage.

[23] See, for example, Asquith, P., Pathak,P., Ritter,J., 2005, Short interest, institutional ownership, and stock returns, Journal of Financial Economics 78, at 243; Boehme, Rodney D., Bartley R. Danielsen, Praveen Kumar, and Sorin M. Sorescu, 2009, Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) Meets Miller (1977), Journal of Financial Markets, 12 at 438; and Akbas, Ferhat, William Armstrong, Sorin Sorescu, and Avanidhar Subrahmanyam, 2015, Smart Money, Dumb Money, and Equity Return Anomalies, Journal of Financial Economics, 118, at 355.

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

35.  **Exhibit 10** shows that at the end of each quarter, during quarters contained fully within the Class Period, institutions held between 26.79% % and 28.64% of Franklin's shares outstanding, which averages to 27.85% of Franklin's shares outstanding. Similarly, at the end of each quarter, during quarters contained fully within the Class Period, institutions also held between 34.18% and 39.85% of Franklin's public float. I also report the total institutional ownership of Franklin Wireless Common Stock in **Exhibit 10**, which shows that at least 25 institutions held the stock at some point during the Class Period. These data show that a large group of sophisticated institutional investors participated in the market for Franklin Wireless Common Stock. Thus, the significant institutional ownership base for Franklin Wireless Common Stock supports the conclusion that the Common Stock traded in an efficient market during the Class Period.

36.  In sum, Franklin Wireless easily satisfies the intent of this Cammer factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for Franklin Wireless Common Stock during the Class Period.

### 3.4    SEC Form S-3 Filing Eligibility

37.  The fourth Cammer factor cited by the court is SEC Form S-3 filing eligibility:

> *[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.*[24]

38.  Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Securities Exchange Act of 1934 ("Exchange Act"), the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or

---

[24] Cammer, 711 F. Supp. at 1287.

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

defaulted on any material debts or leases.[25] The logic and intuition behind this factor as discussed by the Cammer court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

39. At all times during the Class Period Franklin Wireless easily met the public float requirement. Indeed, on average, Franklin Wireless Common Stock's public float was more than double the required threshold.[26] Furthermore, Franklin Wireless made all required filings with the SEC on a timely manner during the Class Period. Thus, despite not filing a SEC Form S-3, Franklin Wireless met the eligibility requirements during the Class Period.

40. As a result, this factor supports the efficiency of the market for Franklin Wireless Common Stock during the Class Period.

## 3.5 Market Capitalization

41. I have also considered several additional factors beyond the five Cammer factors, the first of which is the total value of stock outstanding, or market capitalization. The Cammer court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[27] Moreover, the Krogman court stated "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[28] Generally, because there is greater investor interest for larger corporations than smaller ones, market capitalization is often considered as a factor in enhancing market efficiency.

42. **Exhibit 8** reports Franklin Wireless's market capitalization throughout the Class Period. This market capitalization ranged between $143.4 million and $294.6 million during the Class Period, with an average market cap of $230.5 million. Franklin Wireless's Common Stock market

---

[25] https://www.sec.gov/files/forms-3.pdf.

[26] Franklin Wireless average public float during the Class Period was $169,943,112 compared to the required threshold of $75,000,000.

[27] Cammer, 711 F. Supp. at 1287.

[28] Krogman, 202 F.R.D. at 478.

---

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

capitalization compares favorably to the market capitalization of other companies in cases where the courts found that security traded in an efficient market.[29] Franklin Wireless's number of shares outstanding ranged from 10.6 million shares to 11.6 million shares during the Class Period.[30] Taking into account Franklin Wireless's higher market capitalization compared to that of securities where the court ruled in favor of an efficient market, its shares outstanding available for trading, its sizeable float as discussed below, and the other factors analyzed herein, the market capitalization is consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period.

### 3.6 Bid-Ask Spread

43. The bid-ask spread of any financial product can be understood as the difference between the price an investor could sell a product at (the bid quote) and the price an investor could purchase the product at (the ask quote). The Krogman court considered a small bid-ask spread as an indicator of market efficiency, as a "large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." [31] A wide bid-ask spread indicates that investors must pay more to buy and receive to sell the given security due to high transaction costs, which may dissuade investors from trading and price discovery leading to a less efficient market. Conversely, a narrower bid-ask spread indicates that a stock is accompanied by low transaction costs, which can increase trading activity around the given stock and lead to a more informationally efficient market.

44. **Exhibit 9** details my findings regarding Franklin Wireless' bid-ask spread over the course of the Class Period. I found monthly percentage bid-ask spreads as the monthly average bid-ask spread as a percentage of the bid-ask midpoint over this time period. Upon review, one can see

---

[29] Certification has been granted in many class action securities matters where the market capitalization of defendant companies is far lower than the average market capitalization of Franklin Wireless stock. See, e.g., The Pennsylvania Avenue Funds v. Inyx Inc., 2011 U.S. Dist. LEXIS 72999, S.D.N.Y (2011) at 28 ("the market capitalization was consistently in excess of $22.4 million throughout the Class Period."); In re DVI, Inc. Securities Litigation, 249 F.R.D. 196, E.D. Pa. (2008) at 212, which was affirmed by the Third Circuit. In re DVI, Inc. Securities Litigation, 639 F.3d 623 3d Cir. (2011) ("The market capitalization of DVI during the Class Period ranged between $300 million to $12 million, following DVI's negative disclosures."); Radient at 574 (C.D. Cal. 2012) ("The value of stock held by non-affiliates ranged from $29.5 million to $73.1 million during the Class Period").

[30] Shares outstanding obtained from Franklin Wireless's SEC filings during the Class Period.

[31] Krogman, 202 F.R.D. at 478.

---

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

that Franklin Wireless's percent bid-ask spread fluctuated between 0.2% and 13.5% over the course of the class period, with a low of 0.23% in November 2020 and a spike of 13.5% on the last day of the class period in April 2021.

45. Franklin Wireless had an average bid-ask spread of 2.73% during the Class Period, and 61.4% of the days in the Class Period traded below this figure, meaning that investors could trade Franklin Wireless Common Stock with low transaction costs. This average is slightly higher compared to the findings of academic studies and other court cases which have concluded that the securities in question were traded in an efficient market, although the difference is not statistically significant.[32] This finding is in line with the fact that Franklin Wireless traded OTC for most of the class period (OTC stocks tend to have higher bid-ask spreads).[33] Moreover, I note the presence of an outlier: the bid-ask spread was unusually high on April 8, 2021 (13.5%), the day when Verizon announced it would no longer be selling the Franklin products that are the subject of the allegations presented in Section 2 of this report. The high bid-ask spread on that particular day is likely to reflect a high level of adverse selection and thus is unlikely to be particularly informative about the efficiency of the market for the Franklin Wireless stock during the Class Period.[34] If the exclude this outlier, the average bid-ask spread drops to 2.65%.[35] Therefore, the average bid-ask spread for Franklin Wireless further supports my opinion that the company was traded in an efficient market throughout the class period.

## 3.7 Public Float

46. Public float refers to the number of shares that are not held by corporate insiders (i.e., the number of shares held by the public). Therefore, a high ratio of public float to shares outstanding indicates that a large percentage of shares outstanding are held by the public and therefore can be

---

[32] *See, e.g., Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, S.D. Fla. (2003) at 501, finding that the average daily relative bid-ask spread of 2.44% weighed in favor of market efficiency. The average bid-ask spread for Franklin Wireless during the class period was 2.72%, and the difference with the 2.44% threshold is not statistically significant ($t=1.56$, $p=0.122$).

[33] Tomy Lee and Chajun Wang (2019), Why Trade Over the Counter? When Investors Want Price Discrimination, Jacobs Levy Equity Management Center for Quantitative Financial Research Paper.

[34] See, e.g., Glosten, L.R., and L.E. Harris (1988), Estimating the Components of the Bid/Ask Spread, Journal of Financial Economics 21, at 123.

[35] The difference with the 2.44% threshold (Cheney v. Cyberguard Corp) is not statistically significant ($t=1.25$, $p=0.215$).

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

traded without restrictions, thus enhancing the efficiency of a market. Conversely, a company may have a large market cap, but if the ratio of public float to shares outstanding is low, then it indicates that the majority of a company's shares are held by insiders and cannot be traded, thus decreasing the efficiency of the market in question.

47.  **Exhibit 10** details my findings regarding the public float, institutional holders, and shares outstanding for Franklin Wireless during the class period. Upon review, insider holdings never exceeded 28.64% of shares outstanding for Franklin Wireless during the Class Period (average = 27.85%). Therefore, approximately 72.15% of Franklin Wireless Common Stock was held by institutions and other outside investors during the Class Period. The large percentage of Common Stock held by non-insiders further supports my conclusion that Franklin Wireless traded in an efficient market over the course of the Class Period.

## 4  ANALYSIS OF THE DIRECT FACTORS FOR MARKET EFFICIENCY

### 4.1  Cause and Effect Relationship Between Company Information and Stock Prices

48.  The fifth Cammer factor relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information.

> *The Cammer court held: ... [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[36]*

49.  To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed key dates pertaining to public news announcements during the Class Period that are likely to contain new information relevant to stock market investors (hereinafter referred to as "*Relevant News Days*"). These announcements include earnings reports, analyst recommendations and research reports, insider transactions, news about product quality, and the announcement pertaining to the listing of its stock on Nasdaq. One would not expect every *Relevant News* announcement to cause a significant stock price movement for a company since investors and analysts may anticipate the reported performance or because the

---

[36] Cammer, 711 F. Supp. at 1291.

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

information may contain a mix of both positive and negative information. It is also possible that the power of the statistical tests might not be sufficiently high to detect every significant price movement during *Relevant News Days*. I also considered the fact that other types of news or information could be less relevant to market investors. For this reason, I excluded from the analysis news that were purely descriptive in nature, as well as news related to the announcement of new products that had been previously pre-announced. [37]

50.   I compared the stock returns and trading volume of Franklin Wireless's Common Stock on trading days containing *Relevant News* announcements versus those metrics on trading days that did not contain any *Relevant News* during the Class Period (hereinafter referred to as the "*Least News Trading Days*").[38] The *Least News Trading Days* provide a benchmark measurement of days in which no company-specific information was provided to the market. If Franklin Wireless's stock prices tend to move more significantly on *Relevant News Days* than on the *Least News Trading Days*, this would support a conclusion of market efficiency.

51.   In order to study the stock price movements for Franklin Wireless on different trading days, I performed an event study.[39] A generally accepted method for performing an event study is to create a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study method, an economist tests whether the deviation from expected price movements (i.e., the abnormal return) is sufficiently large compared to the usual volatility in the Company stock price

---

[37] See, e.g., Sood, A. and G. Tellis, 2009, Do Innovations Really Pay Off? Total Stock Market Returns to Innovation, Marketing Science, 28 at 442.

[38] Least News Trading Days were identified as dates with no earnings reports, no analyst recommendations or research reports, no insider transactions, no news about product quality, and without the announcement pertaining to the listing of its stock on Nasdaq.

[39] An event study is a standard method to analyze the impact of information on market prices that has been adopted in academic research and a wide variety of other applications. See A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, Journal of Economic Literature, Volume XXXV, p.13.

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

return such that simple random movement can be rejected as the cause.

52.  Here, I performed an event study to evaluate whether Franklin Wireless's Common Stock responded to information conveyed to the market during *Relevant News Days*. To conduct the event study, I utilized the methodologies described above that are well-established in academic literature and routinely applied and accepted in the context of securities fraud litigation.

53.  In an effort to isolate the impact of Company-specific news on Franklin Wireless's stock price during the Class Period, I performed regression analyses to measure the relationship between Franklin Wireless's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Franklin Wireless's industry. By modeling how Franklin Wireless's stock price returns moved relative to an overall market index and an industry index, I could also measure its response to Company-specific news.

54.  For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (approximately six months). It is common practice to employ a 120-day estimation period where feasible, however, given the relatively short Class Period, a 90-day estimation period was used (the "Estimation Window").[40] To study the relationship between Franklin Wireless's stock price returns and overall market factors, I used the Nasdaq Composite Total Return Index (XCMP) as the "Market Index." The Market Index is commonly used by economists as a representation of the overall market. To study the relationship between Franklin Wireless's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in Franklin Wireless's particular industry, I used the S&P Global BMI

---

[40] See, e.g., Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, The Business Lawyer 49, at 568 ("The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study."); A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, Journal of Economic Literature 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.")

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

Information Technology Index (SGU18B) as the "Industry Index".[41]

55.  I established the relationship between the daily return of the Company stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[42] As shown in **Exhibit 4**, the event study model revealed a generally positive relation between Franklin's daily returns and those of the overall stock market and industry throughout most of the Class Period. The coefficient on the Industry Index was positive throughout the entire Class Period. In other words, movements of the Market Index and Industry Index help explain movements in Franklin Wireless's stock price. This allowed me to predict Franklin's expected daily return on any given date, once I controlled for that day's market and industry returns. I then subtracted the predicted return from the actual return to get the "abnormal" return, which represented the component of the return that is not attributable to market-wide or industry-wide movements.

56.  Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in Franklin's stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much "randomness" remains in the price movement of Franklin Wireless's Common Stock, after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period. My rolling regression event study adjusts for changing volatility in Franklin Wireless's Common Stock over time.

57. To test for statistical significance, I calculated the t-statistic, which is the test that economists use to determine whether randomness can be rejected as the explanation for an abnormal price movement. The t-statistic measures the number of standard deviations between the

---

[41] The S&P Global BMI Information Technology Index included 1,755 constituents at the end of the Class Period.

[42] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. See A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, Journal of Economic Literature 35, at 15 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."); see also Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, Journal of Finance 50, at 1597.

actual observation and the predicted movement. It is calculated by dividing the abnormal return by the standard deviation of the errors. Probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95% confidence level and a sufficiently large sample size, an abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) approximately 5% of the time in the absence of new company-specific information.[43] In other words, there is a 95% chance that, barring some non-random explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.

58. **Exhibit 6** reports the event study results of Franklin Wireless's 16 *Relevant News Days* during the Class Period. The columns list the dates, description of the announcement, closing stock price, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, and the statistical significance of the abnormal returns. Overall, four Franklin Wireless *Relevant News* announcements caused stock price movements that were statistically significant at the 95% confidence level. I compare this rate with that on the *Least News Trading Days* in the following exhibit.

59. **Exhibit 7** summarizes the statistical comparison of Franklin Wireless's stock returns during the 16 *Relevant News Days* versus these metrics measured on the *Least News Trading Days*. *The Least News Trading Days* include 106 observations, meaning that the tests of statistical significance are based on 122 observations, which represents the sum of the number of *Relevant News Days* and the number of *Least News Trading Days*. As shown in the exhibit, 25.0% of the *Relevant News* announcements caused stock movements that were statistically significant at the 95% confidence level. This compares to 5.66% of the *Least News Trading Days* with statistically significant stock price movements. The difference between the two proportions (19.34%) is statistically significant at the 1% significance level (p=0.0043). This provides strong evidence of a cause-and-effect relationship between information and Franklin Wireless Common Stock price

---

[43] David I. Tabak and Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert, Ch. 19, (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

movements.

60.  This exhibit also shows that the average of the absolute value of stock price movements during Franklin Wireless' *Relevant News Days* was 4.81%. This compares to an average of only 2.28% on the *Least News Trading Days*. This further supports a finding of a strong cause-and-effect relationship between information and Franklin Wireless Common Stock price movements.

61.  Finally, this exhibit reports an average daily trading volume of 19,963.69 shares for Franklin Wireless Common Stock during *Relevant News Days*. This compares to an average daily trading volume of 13,420.31 shares during *Least News Trading Days*. The difference between the two averages (6,543.38 shares) is statistically significant at the 95% confidence level (p=0.0456), providing further evidence of the cause-and-effect relationship between information and Franklin Wireless's Common Stock price movements.

62.  In summary, relative to *Least News Trading Days,* Franklin Wireless's *Relevant News* announcements caused a significantly greater proportion of statistically significant stock price movements, absolute levels of price changes, and increases in trading volume. This finding establishes a clear cause-and-effect relationship between new company-specific information and Franklin Wireless Common Stock price movements. As a result, this price impact analysis supports the conclusion that Franklin Wireless's Common Stock traded in an efficient market during the Class Period.

## 4.2   Autocorrelation

63.  Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns. The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated. A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days. A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse. Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters, and is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices.

64.   I use an established methodology, i.e., a regression analysis, to test for autocorrelation in Franklin Wireless's Common Stock returns.[44] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[45] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

65. **Exhibit 12** presents the results from the autocorrelation test for Franklin Wireless's Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period is not statistically significant. Moreover, the quarterly autocorrelation coefficients alternate between positive and negative throughout the Class Period, indicating no consistent predictability in the Company's daily stock returns over time. Thus, I find no evidence of persistent autocorrelation in Franklin Wireless's Common Stock returns. This finding supports the conclusion that Franklin Wireless's Common Stock traded in an efficient market during the Class Period.

# 5   ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

66.   As outlined in the Complaint, Plaintiffs allege that Defendants violated section 10(b) of the Securities Exchange Act when they did not disclose that their products were defective and

---

[44] I evaluate abnormal returns, the calculation of which was described in Section 4.1 of this report.

[45] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, Journal of Finance 61, at 2367-68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, Journal of Financial Economics 6, at 95-101.

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

could cause injury. The class-wide damages calculation for this type of claim follows the "out- of-pocket" method, a standard and well-accepted methodology under Section 10(b) of the Exchange Act. This approach calculates damages formulaically based on the losses suffered by investors due to artificial inflation.

67.  Daily levels of artificial inflation can be calculated as the difference between the traded security price and the true value of the security during the class period, where the true value represents what the stock price would have been but-for any withheld disclosures from the company. The out-of-pocket method then calculates damages for each member of a class as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. If shares are not sold prior to the relevant fraud disclosure, then the difference is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995 ("PSLRA").[46]

68. Class members can provide the information necessary for this damages calculation methodology, such as relative purchase and sale information, during the claims process. The information surrounding an individual's claim can also be verified by reviewing brokerage statements and other documentation of securities transactions.  This information can then be used to quantify artificial inflation per share for each day of the Class period and then calculate damages using the aforementioned formula for each class member, meaning the methodology can be applied class-wide.

69.  The damages calculation process generally begins by conducting some form of loss causation analysis, typically an event study. The purpose of an event study is to establish how much of an asset's price movement is due to market, industry, or other firm-specific factors versus how much is directly attributable to a company's corrective disclosure. This separation can be achieved through a variety of methods, including analyzing intraday pricing (for multiple disclosures in a given day), reviewing accounting or other company specific information, or

---

[46] The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish  damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the  difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security  and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." See, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

examining analyst reports and other media commentary.

70. Event studies are a common and widely accepted standard practice for calculating and determining the significance of artificial inflation. Once it is verified that the impact of "confounding information" on Franklin Wireless securities' prices was significant and separate from market or industry induced price movements, damages can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during the discovery process and will be based on the specific set of facts and circumstances in a given case.

71. A loss causation analysis must also document how artificial inflation per share evolved throughout the Class Period. There are several methods for computing artificial inflation, including the frequently employed "constant dollar inflation" and "constant percentage inflation" methods. Constant dollar inflation assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period whereas constant percentage inflation assumes that per share inflation equaled a constant percentage amount above the correct stock price over the Class Period. In some instances, artificial inflation may vary throughout the class period and require a more involved approach to quantification. Regardless of the methodology employed, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can be performed on a class-wide basis; the calculations are not dependent upon individual class member identities or circumstances.

## 6 CONCLUSION

72. In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that Franklin Wireless's Common Stock traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

I declare under penalty of perjury that the foregoing is true and correct.

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

*RESPECTFULLY SUBMITTED THIS JULY 22, 2022*

Sorin M. Sorescu, Ph.D.

_____

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

## APPENDIX A

## **Sorin M. Sorescu**
Professor of Finance
*Foreman R. and Ruby Bennett* Chair in Business Administration
Mays Business School at Texas A&M University

## Education

| | |
|---|---|
| 1996 | Ph.D. in Finance, University of Florida |
| 1991 | Master of Business Administration, McGill University |
| 1989 | Bachelors of Electrical Engineering, McGill University |

## Employment

**Mays Business School, Texas A&M University**

| | |
|---|---|
| 2018 – Present | Foreman R. and Ruby Bennett Chair in Business Administration |
| 2020 – Present | Executive Associate Dean |
| 2020 – 2021 | Interim Executive Associate Dean |
| 2009 – 2021 | Head of the Adam C. Sinn `00 Department of Finance |
| 2016 – 2018 | Ruby and Earle A. Shields Jr. '41 Chair in Investment Advising |
| 2007 – 2016 | Patricia and Bookman Peters Research Professorship |
| 2009 – Present | Professor (tenured) |
| 2009 – Present | Associate Professor (tenured) |

**Bauer College of Business, University of Houston**

| | |
|---|---|
| 1996-2002 | Assistant Professor |

**CAE Electronics (Montreal, Canada)**

| | |
|---|---|
| 1988-1990 | Electrical Engineer |

## Areas of Research Interest

- Market Efficiency
- Investments, Asset Management and Asset Allocation
- Informational Content of Security Prices

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

## Work in Progress

- Predictability in stock returns and in the performance of mutual funds

- Informational content of security prices

- Economic consequences of deficit spending and expansionary monetary policy.

## Expert Witness and Consulting

- ForesTech Energy, LLC v. German Pellets Texas LLC, German Pellets Holding USA, Inc, and German Pellets GmbH (2015)—consulting expert on valuation of a wood pellet mill and associated equity claims. Attorneys: Orgain, Bell, & Tucker, Beaumont, TX. Retained by counsel for the plaintiff to prepare expert report. Case settled before deposition.

- Houston Police Officers Pension System v. State Street Bank and Trust (2009-2012)—consulting expert on matters related to disclosure in a case involving subprime mortgage-backed securities. Attorneys: Ropes and Gray, Boston, MA. Retained by counsel for the defendant to prepare expert report. Testified at deposition in May 2010. Case settled before trial.

- Memorial Hermann Hospital System v. State Street Bank and Trust (2009-2012)—consulting expert on matters related to disclosure in a case involving subprime mortgage-backed securities. Attorneys: Ropes and Gray, Boston, MA. Retained by counsel for the defendant to prepare expert report. Testified at deposition in May 2010. Case settled before trial.

- Securities and Exchange Commission v. Rose et al. (2006-2007)—consulting expert in a case involving manipulation of security prices by traders. Attorneys: SEC Central Regional Office, Denver, CO. Retained by counsel for the plaintiff. Prepared expert report and testified in Federal Court (Houston, TX) in April 2007.

## Refereed Publications

- Sorescu, Alina, Sorin Sorescu, William Armstrong, and Bart Devoldere, 2018, "Two Centuries of Innovations and Stock Market Bubbles," winner of an MSI Research Competition Grant, 2013, winner of the Best Paper Award at the Strategic Management Conference, Lausanne, 2013, winner of Mays Business School interdisciplinary research proposal, Marketing Science, 37 (4), 507-529.

- Akbas, Ferhat, Ekkehart Boehmer, Bilal Erturk and Sorin Sorescu, 2017, "Short Interest, Returns, and Information," Financial Management, 46(2), 455-486.

- Sorescu, Alina and Sorin Sorescu, 2016, "Customer Satisfaction and Long-Term Stock Returns," Journal of Marketing, 80 (September), 110-115.

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

- Akbas, Ferhat, William Armstrong, Sorin Sorescu, and Avanidhar Subrahmanyam, 2016, "Capital Markets Efficiency and Arbitrage Efficacy," Journal of Financial and Quantitative Analysis, 51 (2), 387-413.

- Akbas, Ferhat, William Armstrong, Sorin Sorescu, and Avanidhar Subrahmanyam, 2015, "Smart Money, Dumb Money, and Equity Return Anomalies," Journal of Financial Economics, 118 (2), 355-382.

- Johnson, Shane, Theodore Moorman, and Sorin M. Sorescu, 2009, "A Reexamination of Corporate Governance and Equity Prices," Review of Financial Studies, 22 (11), 4753-4786.

- Boehme, Rodney D., Bartley R. Danielsen, Praveen Kumar, and Sorin M. Sorescu, 2009, "Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) Meets Miller (1977)," Journal of Financial Markets, 12 (3), 438-468.

- Kumar, Praveen, Sorin M. Sorescu, Rodney D. Boehme, and Bartley R. Danielsen, 2008, "Estimation Risk, Information, and the Conditional CAPM," Review of Financial Studies, 21 (3), 1037-1076. Leading article.

- Kolari, Jim, Theodore Moorman, and Sorin M. Sorescu, 2008, "Foreign Exchange Risk and the Cross- Section of Stock Returns," Journal of International Money and Finance, 27 (7), 1074-1097.

- Boehme, Rodney D., Bartley R. Danielsen, and Sorin M. Sorescu, 2006, "Short-sale Constraints, Dispersion of Opinion and Overvaluation," Journal of Financial and Quantitative Analysis, 41 (2), 455-487.

- Sorescu, Sorin M., and Avanidhar Subrahmanyam, 2006, "The Cross-Section of Analyst Recommendations," Journal of Financial and Quantitative Analysis, 41 (1), 139-168.

- Boehme, Rodney, and Sorin M. Sorescu, 2002, "The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?," Journal of Finance, 57 (2), pp. 871-900.

- Danielsen, Bartley, and Sorin M. Sorescu, 2001, "Why do Option Introductions Depress Stock Prices?

- An Empirical Study of Diminishing Short Sale Constraints," Journal of Financial and Quantitative Analysis, 36 (4), pp. 451-484.

- De Young, Robert, William Lang, Mark J. Flannery, and Sorin M. Sorescu, 2001, "The Information Content of Bank Exam Ratings and Subordinated Debt Prices," Journal of Money, Credit and Banking, 33 (4), pp. 900-925.

- Sorescu, Sorin M., 2000, "The Effect of Options on Stock Prices: 1973-1995," Journal of Finance, 55 (1), pp. 487-514.

- Flannery, Mark J., and Sorin M. Sorescu, 1996, "Evidence of Bank Market Discipline in Subordinated Debenture Yields: 1983-1991," Journal of Finance, 51 (4), pp. 1347-1377.

## Applied Research

- Baratsas, Stefanos. G., Alexander M. Niziolek, Onur Onel, Logan R. Matthews, Christodoulos A. Floudas, Detlef R. Hallermann, Sorin M. Sorescu, and Efstratios N. Pistikopoulos, 2021, "A framework to predict the price of energy for the end-users with applications to monetary and energy policies" Nature Communications 12 (18).

- Baratsas, Stefanos, Christodoulos Floudas, Efstratios Pistikopoulos, and Sorin M. Sorescu, 2018. We developed the Texas A&M Energy Price Index (TEPI). Comprised of 56 different energy products, the TEPI measures changes in the price level of representative basket of energy consumption from the perspective of the aggregate US consumer.

## Visiting Scholar

- Vrije Universiteit Amsterdam, The Netherlands, June 2019

## Invited Presentations

- Texas Tech University, Spring 2013

- University of Georgia, Spring 2010

- Florida State University, Spring 2010

- Tilburg University, Spring 2008

- University of Florida, Spring 2007

- University of Texas San Antonio, Fall 2006

- University of Kansas, Spring 2003

- Texas Christian University, Spring 2003

- Texas A&M University, Fall 2001

- Stockholm School of Economics, Fall 2000

- Swedish School of Economics and Business Administration, Fall 2000

- University of Houston, Spring 1996

- Rutgers University, Spring 1996

- University of Wisconsin – Milwaukee, Spring 1996

- Federal Reserve Bank of Chicago, Spring 1996

- Michigan State University, Fall 1995

- Laval University, Spring 1995.

- National Association of State Retirement Administrators, Fort Lauderdale, FL, 2007

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

- The Chicago Quantitative Alliance spring meeting, Las Vegas, NV, 2008

- The Super Bowl of Indexing, Phoenix, AZ, 2008

- Macquarie Securities Seminar, New York, NY, 2009

## Conference Presentations and Proceedings

- Akbas, Ferhat, William Armstrong, Sorin Sorescu and Avanidhar Subrahmanyam, "Smart Money, Dumb Money, and Equity Return Anomalies," presented at the 2015 meetings of the American Finance Association, Boston, MA, January 2015.

- Akbas, Ferhat, William Armstrong, Sorin Sorescu and Avanidhar Subrahmanyam, "Time Varying Market Efficiency," presented at the 2013 annual meetings of the American Finance Association, San Diego, CA, January 2013.

- Kumar, Praveen, Sorin M. Sorescu, Rodney D. Boehme and Bartley R. Danielsen, 2007, "Estimation Risk, Information, and the Conditional CAPM," presented at the 2007 annual meetings of the Western Finance Association, Big Sky, Montana, 2007.

- Johnson, Shane, Theodore Moorman and Sorin M. Sorescu, 2006,"Governance, Stock Returns and Market Efficiency," presented at the 2007 annual meetings of the American Finance Association, Chicago, IL, January 2007.

- Kolari, Jim, Theodore Moorman and Sorin M. Sorescu, 2006, "Foreign Exchange Risk and the Cross-Section of Stock Returns," presented at the 2006 meetings of the Financial Management Association, Salt Lake City, UT, October 2006.

- Boehme, Rodney D., Bartley R. Danielsen Praveen Kumar and Sorin M. Sorescu, 2006, "Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) meets Miller (1977)," presented at the 2006 annual meetings of the Western Finance Association, Keystone, CO, June 2006.

- Boehme, Rodney D., Bartley R. Danielsen and Sorin M. Sorescu, 2003, "Short Sale Constraints and Overvaluation," presented at the 2003 meetings of the American Finance Association, Washington, DC, January 2003.

- Boehme, Rodney D., Bartley R. Danielsen and Sorin M. Sorescu, 2002, "Long-Term Performance after Stock Splits: Underreaction or Market Friction?," presented at the 2002 meetings of the Financial Management Association, San Antonio, TX, October 2002.

- Boehme, Rodney, and Sorin M. Sorescu, 2000, "The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?," presented at the October 2000 Annual Meetings of the Financial Management Association, Seattle, Washington.

- Boehme, Rodney, and Sorin M. Sorescu, 2000, "The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?," presented at the

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

August 2000 Annual Meetings of the European Finance Association, London, United Kingdom.

- Danielsen, Bartley, and Sorin M. Sorescu, 2000, "Why do Option Introductions Depress Stock Prices? An Empirical Study of Diminishing Short Sale Constraints," presented at the October 2000 Annual Meetings of the Financial Management Association, Seattle, Washington.

- Ramchand, Latha, and Sorin M. Sorescu, 2000, "Long Run stock Returns Following Equity Offerings: A Study of Global Equity Offers by U.S. Firms," presented at the October 2000 Annual Meetings of the Financial Management Association, Seattle, Washington.

- Danielsen, Bartley, and Sorin M. Sorescu, 2000, "Why do Option Introductions Depress Stock Prices? An Empirical Study of Diminishing Short Sale Constraints," presented (by co-author) at the April 2000 Annual Meetings of the Midwest Finance Association, Chicago, Illinois.

- De Young, Robert, William Lang, Mark J. Flannery and Sorin M. Sorescu, 1998, "Could Publications of Bank CAMEL Ratings Improve Market Discipline?," Proceedings of the 34th Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, pp. 402-421.

- DeYoung, Robert, Mark J. Flannery, William Lang and Sorin M. Sorescu, 1998, "The Informational Advantage of Specialized Monitors: The Case of Bank Examiners," presented at the June 1998 Annual Meetings of the Western Economic Association, Lake Tahoe, Nevada.

- DeYoung, Robert, Mark J. Flannery, William Lang and Sorin M. Sorescu, 1998, "Could Publications of Bank CAMEL Ratings Improve Market Discipline?," presented at Federal Reserve Bank of Chicago 34th Annual Conference on Bank Structure and Competition, May 1998, Chicago, Illinois.

- Sorescu, Sorin M., 1996, "The Price Effect of Option Introductions: 1973-1992," presented at the 1996 Annual Meetings of the Financial Management Association, New Orleans, Louisiana.

- Flannery Mark J., and Sorin M. Sorescu, 1995, "Evidence of Bank Market Discipline in Subordinated Debenture Yields: 1983-1991," presented at the October 1995 Annual Meetings of the Financial Management Association, New York City, New York, Winner of the 1995 FMA Award for Best Paper in Financial Institutions.

- Flannery, Mark J., and Sorin M. Sorescu, 1995, "Pricing Bank Default Risk in Subordinated Debenture Yields," Proceedings of the 31st Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, pp. 459-482.

- Flannery, Mark J., and Sorin M. Sorescu, 1995, "Pricing Bank Default Risk in Subordinated Debenture Yields," presented at the Federal Reserve Bank of Chicago 31st Annual Conference on Bank Structure and Competition, May 1995, Chicago, Illinois.

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

## Teaching and Student Learning

**Undergraduate Courses**

- Financial Markets and Institutions, Texas A&M University, 2017, 2018, 2020

- Aggies on Wall Street, Texas A&M University, 2014, 2015, 2016

- Trading and Active Management, Texas A&M University, 2008

- Introduction to Trading and Investments, Texas A&M University, 2011

- Investments, Texas A&M University, 2006, 2008

- Advanced Corporate Finance, University of Florida, 1995-1996

- Financial Markets and Institutions, University of Houston, 1996-2002

- Venture Capital (Maroon Fund), 2013-2015

**MBA and MS Courses**

- Macro-Economics, Texas A&M University, 2012

- Investments, Texas A&M University, 2010

- Advanced Corporate Finance, University of Houston, 1998

- Financial Markets, University of Houston, 1996-2001

- Advanced Corporate Finance, Texas A&M University, 2002-2004

**Executive and Professional MBA Courses**

- Investments, Texas A&M University, 2010

- Corporate Finance and Financial Markets, University of Houston, 1998-2002

- Corporate Finance, Texas A&M University, 2013, 2014

- Corporate Finance and Valuation, Texas A&M University, 2015

**Doctoral Courses**

- Empirical Research Seminar in Financial Markets, University of Houston, 1999, 2001

- Empirical Research Seminar in Asset Pricing, Texas A&M University, 2004, 2006

**Doctoral Committees**

- Chair or co-chair of the PhD Advisory Committee for Ferhat Akbas (2008-2011), Alex Petkevich (2008-2011), Ted Moorman (2003-2005), Bilal Erturk (2003-2006), and Will Armstrong (2009-2012).

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

## Service

**Texas A&M University**

- Member of the advisory board of the Texas A&M Energy Institute (2018 to present)

- Member of the advisory board of ADVANCE, a program of Texas A&M University whose mission is to promote improvement of workplace climate, recruitment and retention of faculty, and the development of faculty leaders committed to diversity, equity, and inclusion (2020 to present)

- Member of the advisory board of Innovation Partners, one of units through which Texas A&M University promotes technology commercialization (2021 to present)

- Member of the advisory board of the School of Innovation (2019 to 2021)

- Member of a university committee charged with establishing a faculty code of conduct at Texas A&M University (2019-2020)

- Led a taskforce that prepared a proposal for funding technology commercialization at Texas A&M, presented to the Dean of the School of Innovation (2019)

- Prepared and moderated a faculty retreat in the Department of Wildlife and Fisheries of the College of Agriculture and Life Sciences (2017-2018)

- Prepared and delivered a presentation to a session organized by the Dean of Faculties related to departmental budgeting and opportunities to increase revenue (2017)

- Invited (twice) by the Women's Faculty Network to be a panelist or guest speaker in events related to promoting gender diversity on campus (spring 2017)

- Chair of the search committee for the new head of the Jim Benjamin Department of Accounting (2019-2020)

- Member of the search committee for the Director of the Texas A&M Energy Institute (2017)

- Mentor to the Mays Regents Scholars (2006-2007)

- Member of the faculty search committee in the Adam C. Sinn `00 Department of Finance (2003-2007)

- Director of the PhD Program in Finance (2003-2006, 2008)

- Chair of the faculty search committee in the Adam C. Sinn `00 Department of Finance (2002-2003)

- Coordinator of the Finance seminar series in the Adam C. Sinn `00 Department of Finance (2002-2003).

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

**Profession**

Referee for peer-reviewed journals:
- Journal of Finance
- Review of Financial Studies
- Journal of Financial Markets
- Journal of Money, Credit, and Banking
- Journal of Financial Intermediation
- Journal of Financial and Quantitative Analysis
- Management Science
- Financial Management
- Financial Review
- Quarterly Review of Economics and Finance
- Journal of Financial Research.

Member of the program committee:
- Eastern Finance Association
- Financial Management Association
- Western Financial Association.

Conference discussant:
- American Finance Association
- NBER
- Eastern Finance Association
- European Finance Association
- Financial Management Association
- ITAM Asset Pricing Conference.

Practitioner events:
- Invited by Citibank to moderate a panel of hedge fund managers in Austin, Texas (2016-2018).

## Executive and Professional Education

- Gerson Lehrman Group, New York, NY (2007-2009)

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

- o Conducted several seminars on the topic of return predictability in stock returns
- El Paso Energy, Houston, TX (2000-2002)
  - o Designed and conducted a 40-hour training program for El Paso's entry-level analyst class
- Shell Oil, Houston, TX (1998-2000)
  - o Designed and conducted an executive-level course in corporate finance

**Invited Presentations**

- Federal Deposit Insurance Corporation (FDIC): Developing Tomorrow's Community Bankers: A Discussion Between Educators and the Industry, Washington, DC and Dallas, TX (2016)
  - o Both events featured the Commercial Banking Program from Mays Business School
- National Association of State Retirement Administrators, Fort Lauderdale, FL (2007)
  - o Presented a summary of my research on the predictability of stock returns, with an emphasis on the paper "A Reexamination of Corporate Governance and Equity Prices" co-authored with Shane Johnson and Theodore Moorman
- The Chicago Quantitative Alliance spring meeting, Las Vegas, NV (2008)
  - o Presented a summary of my research related to predictability in stock returns
- The Super Bowl of Indexing, Phoenix, AZ (2008)
  - o Presented a summary of my research related to predictability in stock returns
- Macquarie Securities Seminar, New York, NY (2009)
  - o Presented a summary of my research related to predictability in stock returns

## Administrative Accomplishments

**Fundraising and External Relations at Texas A&M University**

- Raised $20 million gift to name the Adam C. Sinn `00 Department of Finance
- Established the Reveille Investment Fund ($7.5 million)
- Raised $1.2 million for the Center for Retailing Studies
- Raised $6 million for the Petroleum Ventures Program
- Raised in excess of $4 million for the Commercial Banking Program

**Internal Resource Generation**

- Created the Master of Science in Finance

- Created the Master of Science in Quantitative Finance
- Secured additional $3.5 million in base funding for Mays Business School

**Faculty Recruiting**

- Added 13 new faculty lines to the Adam C. Sinn `00 Department of Finance between 2012 and 2022
- Added 20 new faculty lines to Mays Business School during academic year 2021-2022

**Curricular Development and Student Success**

- Aggies on Wall Street – educational program focused on investment banking
- Aggies in Tech – educational program focused on the technology sector
- Reveille Investment Fund
- Commercial Banking Program

## Award and Honors

- Mays Faculty Service Excellence Award, Mays Business School, Texas A&M University (academic year 2019-2020)
- Foreman R. and Ruby Bennett Chair in Business Administration, Mays Business School, Texas A&M University (2018-present)
- Selfless Service Resolution passed by the Student Senate of Texas A&M University in recognition of 15 years of service to the university and its student body (2017)
- Ruby and Earle A. Shields Jr. '41 Chair in Investment Advising, Mays Business School, Texas A&M University (2016-2018)
- Dan H. Robertson Outstanding MBA Faculty Member Award, selected by MBA students as best teacher in the MBA Program, Texas A&M University (2013)
- Patricia and Bookman Peters Research Professorship, Mays Business School, Texas A&M University (2007-2016)
- Mays Research Fellow, Mays Business School, Texas A&M University (2003-2007)
- Bauer Faculty Fellow, C.T. Bauer College of Business, University of Houston (2001-2002)
- MidCon Award for Best Teaching Performance in the Executive MBA Program, C.T. Bauer College of Business, University of Houston (2000)
- Melcher Teaching Fellow, College of Business Administration, University of Houston (2000)
- Melcher Research Fellow, College of Business Administration, University of Houston (1999)
- Melcher Teaching Fellow, College of Business Administration, University of Houston (1998)

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

- MidCon Award for Best Teaching Performance in the Executive MBA Program, College of Business Administration, University of Houston (1998)

- Presidential Recognition for outstanding student, University of Florida (1996)

- Doctoral Student Consortium Fellow, Financial Management Association (1995)

- Competitive Paper Award for Best Paper in Financial Institutions, Financial Management Association (1995)

- Competitive Doctoral Fellowship from the Social Sciences and Humanities Research Council of Canada (1992-1995)

- McGill Associates Medal and Fellowship for Best MBA Student, McGill University (1991).

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

## APPENDIX B

### Works Considered

**Court Documents:**

Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988).

Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989).

Cheney v. Cyberguard Corp., 213 F.R.D. 484, S.D. Fla. (2003).

Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 283-84 (2014).

Hayes v. MagnaChip Semiconductor Corp., Case No. 14-cv-01160-JST (N.D. Ca. 2016).

In re DVI, Inc. Securities Litigation, 249 F.R.D. 196, E.D. Pa. (2008)

In re DVI, Inc. Securities Litigation, 639 F.3d 623 3d Cir. (2011)

In re Countrywide Financial Corp. Sec. Litig., 273 F.R.D. 586, 614 (C.D. Ca. 2009).

In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260, 281 (N.D. Ala. 2009).

Krogman v. Sterritt, 202 F.R.D. 467 (N.D. Tex. 2001).

The Pennsylvania Avenue Funds v. Inyx Inc., 2011 U.S. Dist. LEXIS 72999, S.D.N.Y (2011).

Vinh Nguyen v. Radient Pharms. Corp., 287 F.R.D. 563, 572-73 (C.D. Ca. 2012).

**Academic Literature:**

Akbas, Ferhat, William Armstrong, Sorin Sorescu, and Avanidhar Subrahmanyam, 2015, Smart Money, Dumb Money, and Equity Return Anomalies, Journal of Financial Economics 118.

Asquith, P., P. Pathak, and J. Ritter, 2005, Short interest, institutional ownership, and stock returns, Journal of Financial Economics 78.

Avramov, Doron, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, Journal of Finance 61.

Barber, Brad M, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, Journal of Corporate Law 19.

Boehme, Rodney D., Bartley R. Danielsen, Praveen Kumar, and Sorin M. Sorescu, 2009, Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) Meets Miller (1977), Journal of Financial Markets 12.

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

Boehme, Rodney, and Sorin M. Sorescu, 2002, The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?, Journal of Finance 57.

Braun, Phillip A., Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, Journal of Finance 50.

Danielsen, Bartley, and Sorin M. Sorescu, 2001, Why do Option Introductions Depress Stock Prices? An Empirical Study of Diminishing Short Sale Constraints, Journal of Financial and Quantitative Analysis 36.

David I. Tabak and Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert, Ch. 19, (3rd ed. 2001).

Fama, Eugene F., 1998, Market Efficiency, Long-Term Returns, and Behavioral Finance, Journal of Financial Economics 49.

Glosten, L.R., and L.E. Harris (1988), Estimating the Components of the Bid/Ask Spread, Journal of Financial Economics 21.

Hou, Kewei, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, Review of Financial Studies 33.

Jensen, Michael C., 1978, Some Anomalous Evidence Regarding Market Efficiency, Journal of Financial Economics 6.

Johnson, Shane, Theodore Moorman, and Sorin M. Sorescu, 2009, A Reexamination of Corporate Governance and Equity Prices, Review of Financial Studies 22.

Lee, Tomy and Chaojun Wang (2019), Why Trade Over the Counter? When Investors Want Price Discrimination, Jacobs Levy Equity Management Center for Quantitative Financial Research Paper.

MacKinlay, A. Craig, 1997, Event Studies in Economics and Finance, Journal of Economic Literature 13.

Mitchell, Mark L. and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, The Business Lawyer 49.

Sood, A. and G. Tellis, 2009, Do Innovations Really Pay Off? Total Stock Market Returns to Innovation, Marketing Science 28.

Thomas, Randall S. and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, Law and Contemporary Problems 63.

**Data Sources:**

Franklin Wireless Corporation Press Releases

**PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL**

Factiva

ABI/INFORM

Dow Jones Institutional News

BuySellSignals Research

## Exhibit 1



Franklin Wireless (FKWL) Closing Price and Volume
17 Sep 2020 - 9 Apr 2021

Franklin Lists on NASDAQ
(29 March 2021)

Franklin reveals battery
issues (1 April 2021)

Franklin's customer Verizon recalls 2.5
million mobile hotspot units (8 April 2021)

Franklin addresses Verizon's recall, saying
they're working on fixing battery issue (9
April 2021)

Volume    Closing Price

Data source: S&P Capital IQ

**EXHIBIT 2**



Franklin Wireless Common Stock Average Weekly Trading Volume as a Percentage of Shares Outstanding, 17 Sep 2020 - 9 Apr 2021

Data Sources: S&P Capital IQ and SEC Edgar

Case 3:21-cv-00687-AJB-MSB Document 41-3 Filed 07/22/24 PageID.753 Page 46 of 56

47 of 56

PRIVILEGED AND HIGHLY CONFIDENTIAL – PREPARED FOR COUNSEL

## EXHIBIT 3

**Summary of Securities Analyst Reports Issued for Franklin Wireless**

| | Analyst Name | Reports Issued During the Class Period: 17 Sep 2020 - 8 Apr 2021 |
|---|---|---|
| [1] | BuySellSignals Research | 3 |
| [2] | Lake Street Capital Markets | 3 |
| [3] | CapitalCube | 2 |
| [4] | Cowen and Company | 2 |
| [5] | Wright Reports | 2 |
| [6] | Corporate Watchdog Reports | 1 |
| [7] | Smart Insider | 1 |
| [8] | Vermilion Technical Research | 1 |
| | **Total** | **15** |

Data Source: Investext

PAGE 45

## EXHIBIT 4



Coefficients from Rolling Event Study Regression for Franklin Wireless Common Stock
17 Sep 2020 - 8 Apr 2021

Data Source: S&P Capital IQ and Bloomberg

Case 3:21-cv-00687-AJB-MSB Document 41-3 Filed 12/21/21 PageID.715 Page 4 of 5
48 of 56

# EXHIBIT 5



Standard Deviation of the Errors for Rolling Event Study Regression for Franklin Wireless Common Stock
17 Sep 2020 - 8 Apr 2021



Data Source: S&P Capital IQ and Bloomberg

**EXHIBIT 6**

## Event Study Analysis of Franklin Wireless *Relevant News Days*

| Date | Description of Announcement | Closing Stock Price | Raw Return (%) | Abnormal Return (%) | Abnormal Dollar Change | T-statistic | Significance Level |
|---|---|---|---|---|---|---|---|
| 2020-09-18 | Earnings report | $14.25 | 5.41% | 5.64% | $0.78 | 1.84 | |
| 2020-09-21 | Analyst recommendation | $15.00 | 5.13% | 5.02% | $0.69 | 1.63 | |
| 2020-10-01 | Favorable Research Report | $16.48 | 3.02% | 2.82% | $0.46 | 0.92 | |
| 2020-10-05 | Insider purchase | $16.10 | -1.85% | -2.33% | -$0.38 | -0.76 | |
| 2020-11-16 | Earnings report | $21.00 | 4.43% | 4.01% | $0.82 | 1.31 | |
| 2020-11-17 | Analyst recommendation | $21.96 | 4.47% | 4.57% | $0.94 | 1.49 | |
| 2020-11-30 | Insider purchase | $22.99 | 6.70% | 6.59% | $1.46 | 2.15 | ** |
| 2020-12-21 | Favorable Research Report | $23.50 | 11.25% | 11.27% | $2.50 | 3.67 | *** |
| 2020-12-28 | Insider purchase | $22.34 | 1.81% | 1.65% | $0.37 | 0.54 | |
| 2021-01-04 | Favorable Research Report | $23.75 | 1.06% | 1.22% | $0.29 | 0.40 | |
| 2021-01-12 | Insider sale | $21.30 | -6.83% | -6.72% | -$1.48 | -2.19 | ** |
| 2021-01-25 | Insider sale | $21.68 | 0.83% | 0.77% | $0.17 | 0.25 | |
| 2021-02-17 | Earnings report | $22.00 | 4.32% | 4.67% | $1.01 | 1.53 | |
| 2021-03-26 | Nasdaq Listing | $20.35 | 2.74% | 1.60% | $0.32 | 0.47 | |
| 2021-04-05 | Product quality | $20.77 | -1.67% | -2.42% | -$0.50 | -0.70 | |
| 2021-04-08 | Product quality | $17.33 | -15.08% | -15.65% | -$2.92 | -4.51 | *** |

Note: "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater.
Source: S&P Capital IQ, Bloomberg, Factiva, Dow Jones Industrial News, BuySellSignal Research, ABI/INFORM

EXHIBIT 7

## Comparison of Statistical Significance and Abnormal Returns for Franklin Wireless
### *Relevant News Days* vs. *Least News Trading Days* During the Class Period

| Statistic | Relevant News Days | Least News Trading Days | Difference between Relevant News Days and Least News Trading Days |
|---|---|---|---|
| N | 16 | 106 | |
| Significant Days at 5% Significant Level | 4 | 6 | |
| % Significant Days at 5% Significant Level | 25.00% | 5.66% | 19.34%[1] |
| Average Absolute Abnormal Return | 4.81% | 2.28% | 2.53% |
| Average Daily Trading Volume | 19,963.69 | 13,420.31 | 6,543.38[2] |

Notes:
[1] This difference is statistically significant at the 1% significance level (z=2.629, p=0.0043)
[2] This difference is statistically significant at the 5% significance level (t=1.96, p=0.0456)

Source: S&P Capital IQ, Factiva, Bloomberg, Dow Jones Industrial News, BuySellSignal Research, ABI/INFORM

Case 3:21-cv-00687-AJB-MSB Document 41-3 Filed 07/21/24 PageID. Page 5 of 55
52 of 56

**EXHIBIT 8**



Franklin Wireless Common Stock Market Capitalization during the Class Period,
17 Sep 2020 - 8 Apr 2021

Data Sources: SEC Filings and S&P Capital IQ

## EXHIBIT 9





Franklin Wireless Common Stock Average Daily Bid-Ask Percentage Spread, 17 Sep 2020 - 8 Apr 2021

86/140 (61.43%) bid-ask spread as % of bid/ask midpoint is under the mean
70/140 (50.00%) bid-ask spread as % of bid/ask midpoint is under the median

Data Source: Bloomberg

EXHIBIT 10

### Franklin Wireless Common Stock Shares Outstanding, Insider Holdings and Institutional Holdings

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings as % of Shares Outstanding | Institutional Holdings (in 000s) | Institutional Holdings as % of Shares Outstanding | Institutional Holdings as % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 31-Dec-20 | 11,576,281 | 5 | 3,531,032 | 121,991 | 8,167,240 | 30.50% | 3,254,793 | 28.12% | 39.85% |
| 31-Mar-21 | 11,590,281 | 11 | 2,666,968 | 169,465 | 9,092,778 | 23.01% | 3,319,629 | 28.64% | 36.51% |
| 31-Jun-21 | 11,590,281 | 21 | 2,589,151 | 84,511 | 9,085,641 | 22.34% | 3,105,374 | 26.79% | 34.18% |

| Total Institutions over Class Period: | 25 | | | Class Period Average: | 25.28% | | 27.85% | 36.85% |
|---|---|---|---|---|---|---|---|---|

Data Source: SEC Filings and S&P Capital IQ

EXHIBIT 11

| No. | Institution | No. | Institution |
|-----|-------------|-----|-------------|
| 1 | Acadian Asset Management LLC | 16 | Northern Trust Global Investments |
| 2 | Aigh Capital Management LLC | 17 | Optimum Investment Advisors LLC |
| 3 | BelleCapital A.G | 18 | O'Shaughnessy Asset Management LLC |
| 4 | BlackRock Inc. | 19 | Renaissance Technologies LLC |
| 5 | Bridgeway Capital Management LLC | 20 | Royal Alliance Associates Inc. |
| 6 | Clearwater Management Co. Inc | 21 | Smith Moore & Co. |
| 7 | G2 Investment Partners Management LLC | 22 | Sowell Financial Services LLC |
| 8 | Geode Capital Management LLC | 23 | UBS Asset Management AG |
| 9 | Globis Capital Management, LLC | 24 | Vanguard Group Inc. |
| 10 | Heartland Advisors Inc. | 25 | Wells Fargo & Co. |
| 11 | JPMorgan Chase & Co. | | |
| 12 | Kennedy Capital Management Inc. | | |
| 13 | Lord Abbett & Co. LLC | | |
| 14 | Morgan Stanley | | |
| 15 | Navellier & Associates Inc. | | |

Data Source: S&P Capital IQ

## EXHIBIT 12

**Franklin Wireless Common Stock**
**Test for Autocorrelation during the Class Period**

| Quarter | Coefficient on Previous Day's Abnormal Return | T-Statistic | P-Values |
|---------|---------------------------------------------|-------------|----------|
| Q3 2020 | -0.23 | -0.71 | 50.10% |
| Q4 2020 | -0.24 | -1.96 | 5.43% |
| Q1 2021 | -0.12 | -0.93 | 35.66% |
| Q2 2021 | 0.95 | 0.61 | 58.36% |
| **Class Period** | **-0.11** | **-1.22** | **22.58%** |

Data Source: S&P Capital IQ