

1
2
3
4
5
6
7
8
9          UNITED STATES DISTRICT COURT

10          SOUTHERN DISTRICT OF CALIFORNIA

11

12  MOHAMMED USMAN ALI,                    Case No.:  21-cv-00687-AJB-MSB
    individually and on behalf of all others
13  similarly situated,                    **ORDER**

14                          Plaintiff,     **(Doc. Nos. 84; 85)**

15  v.

16  FRANKLIN WIRELESS CORP., et al.,

17                          Defendant.

18

19          Before the Court is a motion for final approval of settlement and plan allocation
20  (Doc. No. 83) and a motion for award of attorneys' fees, expenses, and Plaintiff's service
21  award (Doc. No. 84), both filed by Plaintiff Gergely Csaba ("Plaintiff"). Defendants
22  Franklin Wireless Corporation, OC Kim and David Brown (collectively, "Defendants")
23  filed an opposition arguing that the requested attorneys' fees and expenses are "unduly
24  excessive." (Doc. No. 88.) The deadline to object to the settlement was August 1, 2024.
25  (*See* Doc. No. 77.) To date, no objections have been filed or otherwise brought to the
26  Court's attention. For the reasons set forth below, the Court **GRANTS** Plaintiff's motion
27  for final approval (Doc. No. 83), and **GRANTS in part and DENIES in part** Plaintiff's
28  motion for attorneys' fees, expenses, and Plaintiff's service award (Doc. No. 94).

# I.    BACKGROUND

On April 16, 2021, Mohammed Usman Ali filed a putative class action complaint against Defendants for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). (Doc. No. 1.) On September 15, 2021, the Court appointed Gergely Csaba as lead plaintiff and Pomerantz LLP ("Pomerantz" or "Counsel") as lead counsel. (Doc. No. 14.) On November 15, 2021, Plaintiff filed an amended complaint, alleging Defendants violated Sections 10(b) and 20(a) of the Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), and Rule 10b-5 promulgated thereunder. (Doc. No. 26, "FAC".) According to the FAC, Franklin is a "wireless solutions" provider that "sources, manufactures, and supplies its customers with 5G/4G mobile hotspot devices, routers, trackers, and other similar mobile device management ('MDM') solutions." (*Id.* ¶ 20.) Plaintiff alleges that, during the class period, Franklin knew but did not disclose that certain hotspot devices were manufactured with defective lithium-ion batteries and, as such, were prone to overheating rapidly to the point they could "leak, spark, catch fire, burn, explode, or otherwise combust," causing "serious injury." (*Id.* ¶¶ 3, 26–30, 34–63.) Moreover, Plaintiff alleges that Defendants affirmatively misled the market to believe that they had no knowledge of the issue, artificially inflating the securities prices. (*Id.* ¶¶ 88–89, 95–105.)

Defendants filed an answer (Doc. No. 27), and discovery commenced shortly thereafter with the parties exchanging documents on a rolling basis (*see* Doc. No. 85 at 1–17, "Van Decl.," ¶ 10).

On January 3, 2023, after full briefing of the matter by both parties, the Court granted Plaintiff's motion for class certification and certified the following Class:

> All persons and entities other than defendants who purchased or otherwise acquired Franklin Wireless Corporation ("Franklin" or the "Company") common stock between September 17, 2020 and April 8, 2021 (the "Class Period"), inclusive. Excluded from the Class are any parties who are or have been Defendants in this litigation, the present and former officers and directors of Franklin and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any

2

entity in which any current or former Defendant has or had a controlling interest.

(Doc. No. 50 at 3, 11.) The Court also appointed Plaintiff as class representative and Pomerantz as class counsel. (*Id*. at 11.)

After certification, the parties continued to engage in discovery. (*See, e.g.*, Doc. Nos. 52 (joint discovery plan); 53 (case management conference); 55 (request for court-approval of remote deposition protocol).) On April 6, 2023, the parties filed a joint motion to temporarily stay the case pending mediation (Doc. No. 57), which the Court granted on April 10, 2023 (Doc. No. 58).

On May 1, 2023, the parties attended mediation with Jed D. Melnick, Esq., an experienced mediator, which resulted in the parties' agreement to settle the action. (Van Decl. ¶ 13.) The parties memorialized their agreement in a memorandum of understanding (the "Memorandum"), which they fully executed on May 3, 2023. (*Id.*) The Memorandum set forth, among other things, the parties' agreement to settle and release all claims that were asserted or could have been asserted in the action in exchange for a payment by or on behalf of Defendants of $2.4 million for the benefit of the Class. (*Id.*)

Plaintiff subsequently filed a motion for preliminary approval of class action settlement (Doc. No. 63), which the Court denied due to certain deficiencies (Doc. No. 74). The parties then executed the "Amended Stipulation and Agreement of Settlement" (the "Settlement Agreement" or "Settlement") (Doc. No. 75-2), and Plaintiff filed a renewed motion for preliminary approval (Doc. No. 75), which Defendants joined (Doc. No. 76). The Court granted Plaintiff's motion and entered the order granting preliminary approval (the "Preliminary Approval Order"), which *inter alia* approved the Notice in form and content, appointed Epiq as Settlement Administrator, set administrative dates, and tentatively approved the Settlement. (Doc. No. 77.)

On July 25, 2024, Plaintiff filed the declaration of Joseph Mahan, a Settlement Project Manager for Epiq, detailing the Settlement Administrator's progress to date with notice and claims administration in compliance with the Preliminary Approval Order.

(Doc. No. 80.) At that point, the Settlement Administrator had initially mailed 1,765 Notice Packets and was in the process of mailing an additional 843 Notice Packets. (Doc. No. 80-1, "Mahan Decl.", ¶¶ 6–7.) Mahan further declared that the Settlement Administrator had received no requests for exclusion nor any objections from any potential class members. (Mahan Decl. ¶¶ 15–17.) Upon the filing of Mahan's supplemental declaration on September 19, 2024, the Settlement Administrator had mailed 2,704 Notice Packets to potential class members and received 811 Claim Forms. (Doc. No. 85-1, "Suppl. Mahan Decl.", ¶¶ 4, 7.) Further, the website maintained by the Settlement Administration to disseminate information regarding the Settlement had received 1,521 hits, while the call service fielded 40 calls. (*Id.* ¶¶ 5–6.) Mahan reasserted that no requests for exclusion nor objections had been received. (*Id.* ¶¶ 8–9.)

On September 19, 2024, Plaintiff filed the instant motions for final approval and for award of attorneys' fees, expenses, and Plaintiff's award. (Doc. Nos. 83; 84.) In support of these motions, Plaintiff filed an initial declaration by Pomerantz partner Austin P. Van, a supplemental declaration by Mahan, a declaration by Plaintiff (Doc. No. 85-2, "Csaba Decl."), and Pomerantz's billing records for the matter (Doc. No. 96). Upon the Court's order, Van provided a supplemental declaration (Doc. No. 93 at 1–6, "Suppl. Van Decl.") and additional documentation in support the fees motion, including itemized billing records for expenses (Doc. Nos. 93-1; 93-2; 93-3; 93-5; 93-7; 93-8), expert reports (Doc. Nos. 93-4; 93-6), and a supplemental declaration from Plaintiff (Doc. No. 93-9, "Suppl. Csaba Decl.").

On December 16, 2024, the Court held a hearing on both motions. (*See* Doc. No. 98 (hearing).) Van appeared on behalf of the Class and confirmed there were a total of 903 Claim Forms submitted, 644 of which were rejected, leaving 259 Authorized Claimants. (*See id.*) Additionally, Van submitted itemized documentation of an expert fee for the Court's consideration in conjunction with the motion for attorneys' fees. (*Id.*) No objectors appeared.

///

## II.    SETTLEMENT AGREEMENT

The primary terms of the "Amended Stipulation and Agreement of Settlement" executed by Plaintiff, on behalf of himself and the class, and Defendants are as follows. (*See* Doc. No. 75-2.)

### A.    Settlement Amounts

The parties agreed to settle the instant class action for $2.4 million (the "Settlement Amount" or "Gross Settlement Amount") to be paid by Defendant in exchange for the release of claims. (Doc. No. 75-2 ¶ 7.) Pursuant to the Settlement Agreement, Defendants were to transfer the Settlement Amount to an escrow account, where the funds would be invested by an escrow agent. (*Id.* ¶¶ 7, 9.) The escrow agent is to collect and reinvest any accrued interest. (*Id.* ¶ 9.)

The Settlement Amount plus any interest earned thereon will be used to pay: (a) any Taxes; (b) any Notice and Administration Costs; (c) any Litigation Expenses awarded by the Court; and (d) any attorneys' fees awarded by the Court. (*Id.* ¶ 8.) The remaining balance (the "Net Settlement Fund") will be distributed to Authorized Claimants[1] by the Claims Administrator according to the Plan of Allocation. (*Id.* ¶¶ 18–20.) Allocation was approximated as follows:

|  | Total | Per Share |
|---|---|---|
| Settlement Amount | $2,400,000 | $0.95 |
| Estimated Attorneys' Fees (33.33%) | ($799,920) | ($0.32) |
| Estimated Litigation Expenses | ($200,000) | ($0.08) |
| Estimated Notice and Administration Costs | ($100,000) | ($0.04) |
| Projected Interest | $114,000 | $0.05 |
| Projected Taxes | ($10,000) | ($0.01) |
| **Net Settlement Fund** | **$1,404,080** | **$0.55** |

---

[1]    An Authorized Claimant is "a Class Member who submits a Proof of Claim Form to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund." (*Id.* ¶ 1(c).)

(Doc. No. 75 at 11–12; *but see* Doc. No. 83-1 at 20 (revising estimated net per share recovery to be $0.52).)

### B.    Plan of Allocation

Pursuant to the Settlement Agreement and as set forth in the Notice, the Plan of Allocation includes a formula for distribution of the settlement funds to class members after all other distributions have been made. (Doc. No. 75-2 ¶ 20; 75-4 ¶¶ 51–61.) Payments will be made to class members after a final judgment is entered and no longer appealable. (Doc. No. 75-4 ¶ 39.) Each member's payment is based on a "Recognized Loss" calculation that takes into account when the class member purchased the shares of Franklin securities, in what amount, whether the shares were sold, and—if sold—when they were sold and for what amounts. (*Id.* ¶ 46.)

Recognized Loss per share is $0.00 for shares sold prior to April 5, 2021, and for shares purchased on or after April 9, 2021. (*Id.* ¶ 51.) For shares purchased during the Class Period and sold sometime between April 5, 2021, and April 8, 2021, inclusive, the Recognized Loss per share is the amount of per-share price inflation from the date of purchase minus the amount per-share price inflation on the date of sale, as reported in Table 1. (*Id.*) For shares purchased during the Class Period and sold sometime between April 9, 2021, and July 7, 2021, inclusive, the Recognized Loss per share is the lesser of (a) the amount of per-share price inflation on the purchase date as reported in Table 1 or (b) the per-share purchase price less the "90-Day Lookback Value" for the date of sale reported in Table 2. (*Id.*) For shares purchased during the Class Period and still held at the close of U.S. financial markets on July 7, 2021, the Recognized Loss per share is the lesser of (a) the amount of per-share price inflation on the purchase date as reported in Table 1 or (b) the per-share purchase price less the average closing price for the 90-Day Lookback Period ($10.60). (*Id.*)

After every Authorized Claimant's Recognized Loss is calculated, each will receive a *pro rata* share of the Net Settlement Fund based on that Authorized Claimant's Recognized Loss as compared to the total Recognized Loss of all Authorized Claimants.

(Doc. Nos. 75-4 ¶¶ 54–55; 83-1 at 28.)

Any balance remaining in the Settlement Fund six months after the initial distribution will be redistributed to Authorized Claimants who cashed their initial distributions and would receive at least $10.00 of additional redistribution, if Class Counsel and the Settlement Administrator deem it cost-effective after payment of any unpaid fees and expenses incurred from administering the Settlement. (Doc. No. 75-4 ¶ 61.)

### C.    Attorneys' Fees and Litigation Expenses

Pursuant to the Notice, Class Counsel agreed to seek no more than 33.33% of the Settlement Fund, plus interest, in attorneys' fees and no more than $300,000 in litigation expenses. (*Id.* ¶ 64.) However, resolution of any application for such fees and expenses is not material to the Settlement. (*Id.* ¶ 34.)

### D.    Release

In exchange for Defendants' $2.4 million payment, class members who do not opt out release all claims "arising out of or based on the factual allegations in the operative complaint or the circumstances and conduct giving rise to the Action." (Doc. No. 75-2 ¶ 1(nn).) The Settlement Agreement does not release claims relating to the enforcement of the Settlement, claims by anyone who properly requests to be excluded, and claims previously brought derivatively related to Franklin Securities during the Class Period. (*Id.*)

## III.    MOTION FOR FINAL APPROVAL

Plaintiff filed the instant motion for final approval seeking the Court to find that (1) the Settlement is fair, adequate, and reasonable and that (2) Notice effectuated by the Settlement Administrator satisfied due process. (Doc. No. 83.) Defendants filed a response stating that, although they dispute the merits of Plaintiff's case, Defendants agree that this is "the best outcome for the Class[], so long as the settlement funds are used principally to pay 'a substantial cash recovery for the Class' (as Plaintiff states), and not excessively to Plaintiff's counsel." (Doc. No. 88 at 2–3.) For the reasons set forth below, the Court **GRANTS** Plaintiff's motion for final approval.

///

### A.    Legal Standard

A class action may only be settled with court approval, "which may be granted only after a fairness hearing and a determination that the settlement taken as a whole is fair, reasonable, and adequate." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(e)(2)). "Courts reviewing class action settlements must 'ensure[] that unnamed class members are protected from unjust or unfair settlements affecting their rights,' while also accounting for 'the strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020) (quoting *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556, 568 (9th Cir. 2019) (en banc)).

### B.    Class Certification

Before granting final approval of a class action settlement agreement, the Court must first determine whether the proposed class can be certified. *See* Fed. R. Civ. P. 23(e)(1)(B). However, "[i]f the court has already certified a class [prior to the parties reaching settlement], the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted." Fed. R. Civ. P. 23(e)(1) advisory committee's note to 2018 amendment.

Here, the Court certified the Class after full briefing on the matter, prior to the parties reaching a settlement. (*See* Doc. No. 50.) Because the proposed settlement does not call for any changes to the certified Class, the claims, defenses, or issues, the Court does not disturb its prior certification order and that no further analysis is necessary.

### C.    Adequacy of Notice

Next, the Court must determine whether the class members received adequate notice. *See* Fed. R. Civ. P. 23(e)(1) ("The court must direct notice in a reasonable manner to all class members who would be bound by the proposal[.]"). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338 (2011).

As mentioned *supra* § I, the Court approved the proposed notice and notice plan. (Doc. No. 77 at 11–13.) Plaintiff filed a declaration by Settlement Project Manager for the Settlement Administrator, detailing the actions taken by the Settlement Administrator to provide notice in accordance with the Court's order granting preliminary approval. (Doc. No. 80.) Pursuant to the notice plan, the Settlement Administrator disseminated 2,704 Notice Packets to potential class members and nominees, only 233 of which were undeliverable. (Doc. No. 83-1 at 25; Mahan Decl. ¶ 9; Suppl. Mahan Decl. ¶¶ 4, 7.)

Additionally, the Claims Administrator published the Court-approved Summary Notice online in *Globe Newswire*, published all Settlement information online on the Settlement website, and procured call center services to field questions regarding the Settlement. (Doc. No. 83-1 at 25; *see also* Mahan Decl. ¶¶ 10–13.)

Having reviewed the declaration, the Court finds that the Settlement Administrator duly effectuated the court-approved notice and that class members received adequate notice of the settlement.

**D.    Fairness, Reasonableness, and Adequacy of Proposed Settlement**

Traditionally, courts in this Circuit assess the fairness, reasonableness, and adequacy of a proposed settlement by balancing the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021). "The district court's approval order must show not only that 'it has explored [these] factors comprehensively,' but also that the settlement is 'not[] the product of collusion among the negotiating parties.'" *In re Bluetooth*, 654 F.3d at 947 (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *as amended* (June 19, 2000) ("*In re Mego*").

In 2018, Rule 23(e)(2) was amended to require courts to consider whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

    (i)   the costs, risks, and delay of trial and appeal;

    (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and

    (iv)   any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

### 1.    Rule 23(e)(2) Factors

In its Preliminary Approval Order, the Court found that the applicable Rule 23(e)(2) factors weighed in favor of approving the Settlement. (*See* Doc. No. 77 at 6–11.) Because no pertinent facts have changed and no objections have been raised since the Court reached its earlier conclusion, the Court reaffirms and incorporates by reference its analysis of the Rule 23(e)(2) requirements as set forth in the Preliminary Approval Order. (*See id.*) Accordingly, the Court finds the Settlement meets the requirements of Rule 23(e)(2).

### 2.    Additional Ninth Circuit Factors

As the amended Rule 23(e)(2) factors were not intended to replace the factors developed by circuits, the Court now turns to analyze the factors traditionally considered by this Circuit.[2] *See* Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.

///

---

[2]    There is no government actor present in the instant action. *See Churchill Village, LLC v. General Electric*, 361 F.3d 566, 576 n.7 (9th Cir. 2004) ("Because the settlement evaluation factors are non-exclusive, discussion of those factors not relevant to this case has been omitted).

     **i.**     **Strength of Plaintiff's Case; Risk, Expense, Complexity, and Likely Duration; and Risk of Maintaining Class Action Status**

"[T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits . . . for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Just. v. Civ. Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982). "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) (citation omitted).

Here, the Settlement Agreement reaffirms that Defendants "expressly deny" the validity of Plaintiff's claims and any and all allegations of fault, liability, wrongdoing or damages. (Doc. No. 75-2 ¶ J.) In the instant motion, Plaintiff points out that the Class faces hurdles proving scienter, loss causation and damages. (Doc. No. 83-1 at 15–16.) If litigation were to continue, the parties would continue with discovery, including costly expert discovery, possible summary judgment and decertification motion practice, trial preparation, trial, post-trial motions, and appeals.

Balancing the complexity, uncertainty, and delay of continued litigation against the immediacy and certainty of settlement, these factors weigh in favor of approval. *See, e.g.*, *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041–42 (N.D. Cal. 2008); *In re Wireless Facilities, Inc. Sec. Litig.*, No. 04-cv-01589-NLS, 2009 WL 10740561, at *5–*6 (S.D. Cal. Jan. 13, 2009).

     **ii.**     **Amount Offered in Settlement**

"To evaluate the adequacy of the settlement amount, courts primarily consider plaintiffs' expected recovery against the value of the settlement offer." *In re Stable Rd. Acquisition Corp.*, No. 2:21-CV-5744-JFW(SHKx), 2024 WL 3643393, at *8 (C.D. Cal. Apr. 23, 2024). However, "[i]t is well-settled law that a cash settlement amounting to only

a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego*, 213 F.3d at 459 (quoting *Officers for Just.*, 688 F.2d at 628).

Here, the parties negotiated a Gross Settlement Amount of $2.4 million; however, Plaintiff's damages expert estimated damages "are at least $18.6 million." (Doc. No. 83-1 at 19). Plaintiff asserts that this recovery of approximately 12.9% is "well above the median recovery of 1.8% of estimated damages in securities class actions settled in 2022." (*Id.* (citing Janeen McIntosh, Svetlana Starykh, and Edward Flores, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review* (NERA Jan. 24, 2023) at 18 (Fig. 19)).)

Moreover, the 12.9% recovery exceeds similar securities class action settlements approved by courts in this Circuit. *See, e.g.*, *In re Omnivision*, 559 F. Supp. 2d at 1042 (finding a gross settlement amount of "just over 9% of the maximum potential recovery asserted by either party" as weighing in favor of final approval); *McPhail v. First Command Fin. Plan., Inc.*, No. 05CV179-IEGJMA, 2009 WL 839841, at *5 (S.D. Cal. Mar. 30, 2009) (finding a recovery of "only approximately 7% of the estimated damages" as weighing in favor of final approval); *In re Stable Rd.*, 2024 WL 3643393, at *10 (finding a recovery of 10.5% of estimated maximum damages to be "more than two and a half times the typical recovery for cases of a similar magnitude"). As such, this factor weighs in favor of approval.

### iii.    Extent of Discovery Completed and Stage of Proceedings

"The extent of the discovery conducted to date and the state of the litigation are both indicators of Lead Counsel's familiarity with the case and of Plaintiffs having enough information to make informed decisions." *In re Omnivision*, 559 F. Supp. 2d at 1042.

Over the three years the instant action has been pending, Plaintiff interviewed former Franklin employees, consulted with experts regarding loss causation and damages, conducted extensive fact discovery which included reviewing thousands of documents produced by Defendants and third-parties, drafted mediation statements, successfully litigated an opposed motion for class certification, and participated in mediation with an experienced mediator. (Doc. No. 83-1 at 21.)

Class Counsel is thoroughly familiar with the facts of this case and was therefore able to assist Plaintiffs with making an informed decision regarding the merits of the Settlement. As such, this factor weighs in favor of approval.

### iv.    Experience and Views of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *In re Pac. Enter. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). As such, "[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying case." *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529 (citation and internal punctuation omitted).

Here, "[b]oth Parties are represented by experienced counsel and their mutual desire to adopt the terms of the proposed settlement, while not conclusive, is entitled to a great deal of weight." *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007). In addition to being familiar with the present dispute, Class Counsel has significant expertise in securities litigation. (*See* Doc. Nos. 6-7; Doc. No. 83-1 at 23–24.) This factor weighs in favor of approval.

### v.    Reaction of Class Members

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision*, 559 F. Supp. 2d at 1043 (quoting *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529).

Here, no objections to the Settlement by class members have been received and no class members have opted out. (Suppl. Mahan Decl. ¶¶ 8–9; *see also* Doc. No. 98 (hearing).) The absence of opt outs and objections weighs in favor of settlement. *See, e.g.*, *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529 ("The complete absence of Class Member objections to the Proposed Settlement speaks volumes with respect to the overwhelming degree of support for the Proposed Settlement among the Class Members. That unanimous,

positive reaction to the Proposed Settlement is compelling evidence that the Proposed Settlement is fair, just, reasonable, and adequate.").

### vi.    Possibility of Collusion Among the Negotiating Parties

"Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947. As such, courts "should scrutinize agreements for 'subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations,' [including] (1) 'when counsel receive[s] a disproportionate distribution of the settlement'; (2) 'when the parties negotiate a clear sailing arrangement,' under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class." *Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (quoting *In re Bluetooth*, 654 F.3d at 947).

Here, there is neither a clear sailing provision nor a reverter clause. (*See generally* Doc. No. 75-2.) In fact, Defendants filed a response to the instant motion opposing it to the extent that Plaintiff's requested attorney fees and expenses are "unduly excessive." (Doc. No. 88 at 3.) Moreover, as noted in the Preliminary Approval Order, settlement was achieved after extensive discovery, months of preparation and investigation, comprehensive mediation preparation, and hard-fought negotiations facilitated by an experienced mediator. (Doc. No. 77 at 7.) There are no evidence or indications of collusion between the parties in reaching this Settlement. This factor weighs in favor of approval.

### 3.    Conclusion

Having analyzed the Rule 23(e)(2) factors and the Ninth Circuit's factors, and finding them weigh heavily in favor of approval, the Court finds the settlement fundamentally fair, adequate, and reasonable. *See Officers for Just.*, 688 F.2d at 625 ("[I]t

must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution[,] especially . . . in complex class action litigation . . . .").

### E.    Adequacy of Allocation Plan

"Approval of a plan of allocation of settlement proceeds in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Omnivision*, 559 F. Supp. 2d at 1045 (citation and internal punctuation omitted). "It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *Id.* (collecting cases).

Here, the proposed Plan of Allocation is set forth the Notice that was mailed to class members and posted on the Settlement Website. Class Counsel consulted with a damages expert to develop the Plan of Allocation with "the goal of reimbursing class members in a fair and reasonable manner." (Doc. Nos. 83-1 at 28; 75-4 ¶ 47.) As detailed *supra* § II.B, the Net Settlement Fund will be distributed *pro rata* based on each Authorized Claimant's Recognized Losses for all shares of Franklin securities purchased or acquired during the Class Period. (Doc. Nos. 75-4 ¶ 54; 83-1 at 28.) Each Authorized Claimant's Distribution Amount will be the sum of that individual's Recognized Losses, divided by the total Recognized Losses for all Authorized Claimants, multiplied by the Net Settlement Fund amount. (Doc. Nos. 75-4 ¶ 55; 83-1 at 28.) If a Distribution Amount is less than $10.00, no distribution will be made and the amount will not be included in the calculation. (Doc. Nos. 75-4 ¶ 55; 83-1 at 28–29.)

Similar allocation plans have been approved by courts in this circuit as fair, reasonable, and adequate in securities class actions. *See e.g.*, *In re Stable Rd.*, 2024 WL 3643393, at *10; *Mandalevy v. Bolf Holding, Inc.*, No. 3:17-cv-667-GPC-MSB, 2022 WL 4474263, at *10–*11, *16 (S.D. Cal. Sept. 26, 2022); *Mauss v. NuVasive, Inc.*, No. 13-CV-02005-JM-JLB, 2018 WL 6421623, at *4 (S.D. Cal. Dec. 6, 2018).

Moreover, in its Preliminary Approval Order, the Court analyzed the efficiency and fairness of the allocation plan. (Doc. No. 77 at 9–11.) Because no pertinent facts have

changed and no objections have been raised since the Court reached its earlier conclusion, the Court reaffirms and incorporates by reference its analysis of the allocation plan as set forth in the Preliminary Approval Order. (*See id.*)

Accordingly, the Court finds the allocation plan fair, reasonable, and adequate.

**F.    Reasonableness of Settlement Administration Costs**

Per the terms of the parties' proposed Settlement and the order granting preliminary approval, Epiq was approved as the Settlement Administrator and is to be paid from the Settlement Fund up to $250,000.00 for actually incurred expenses and costs. (Doc. No. 75-2 ¶ 13.) Epiq estimated its notice and administration costs would be "approximately $125,000.00. (Doc. No. 75-8 at 3.) Courts regularly award administrative costs associated with providing notice to the class. *See, e.g.*, *Boone v. Amazon.com Servs., LLC*, No. 1:21-CV-00241-KES-BAM, 2024 WL 4712426 (E.D. Cal. Nov. 7, 2024) (awarding $392,341.00 for administrative costs); *Mauss*, 2018 WL 6421623, at *2, *5 (awarding administrative costs not to exceed $250,000.00).

Here, the Settlement Administrator took steps to provide notice and implement the settlement, including: (i) preparing, printing, and mailing the Notice Packet; (ii) designing, implementing and maintaining a website dedicated to the action; (iii) processing and determining the validity of Proofs of Claim; (iv) identifying potential fraudulent Proofs of Claim; (v) determining the validity of any requests for exclusion, written objections, and/or disputes submitted by the Class; (vi) maintaining a Post Office Box to receive undeliverable mail and written communication regarding the Settlement; (vii) reserving the services of a call center to provide information and answers to potential class members; (viii) causing the publication of the Summary Notice in *Globe Newswire*. (Mahan Decl. ¶¶ 3–21.) Moreover, the Settlement Administrator will still have to effectuate the Plan of Allocation, which will require (i) calculating the net settlement fund, individual recognized loss, individual distribution amount, and distributing them; (iii) taking reasonable and diligent steps to have Authorized Claimants cash their distribution checks; (iv) issuing the payment to Class Counsel for attorneys' fees and costs and the service payment to Plaintiff;

(v) remitting taxes to the appropriate taxing authorities; and (vi) such other tasks. (Doc. No. 75-4 ¶¶ 46–63.)

Based on the foregoing, the Court concludes the Settlement Administrator's costs are fair and reasonably incurred for the benefit of the Class. As the Court does not have before it a finalized itemization accounting for all the administration costs, the Court approves the request for settlement administration costs in the amount actually incurred up to $250,000. As soon as practicable and no later than **June 20, 2025**, Plaintiff must file a Status Report addressing (1) completion of payment to Authorized Claimants, (2) the final net per share recovery at payment, and (3) final itemized settlement administration costs. The parties are also ordered to file a Joint Motion for Dismissal of the action concurrently with the Status Report.

### G.    Conclusion

In conclusion, having found the effectuated Notice adequate, the Settlement and Plan of Allocation fair, adequate and reasonable, and the Settlement Administrator's costs tentatively reasonable, the Court **GRANTS** Plaintiff's motion for final approval.

## IV.    MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARD

Plaintiff filed the instant motion seeking an award of 33.33% ($799,920.00) of the Gross Settlement Fund for attorneys' fees, reimbursement of $166,383.87 for litigation expenses incurred, and an award of $7,500 for Plaintiff, each to be paid from the Gross Settlement Fund. (Doc. No. 84.) Defendants oppose Plaintiff's motion arguing that the requested amounts for attorneys' fees and expenses are "unduly excessive." (Doc. No. 88 at 3.) For the reasons set forth below, the Court **GRANTS in part and DENIES in part** Plaintiff's motion for attorneys' fees, litigation expenses, and an award for Plaintiff.

### A.    Legal Standard

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h); *see also* 15 U.S.C. §§ 77z-1(6), 78u-4(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable

21-cv-00687-AJB-MSB

percentage of the amount of any damages and prejudgment interest actually paid to the class."). "Because the relationship between class counsel and class members turns adversarial at the fee-setting stage, district courts assume a fiduciary role that requires close scrutiny of class counsel's requests for fees and expenses from the common fund." *In re Optical Disk Drive Prod. Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020).

### B.    Attorneys' Fees

#### 1.    Legal Standard

"In a common fund case, such as this, the district court has the discretion to choose between either the lodestar or the percentage-of-fund methods when calculating fees." *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738 (9th Cir. 2016); *see also In re Stable Rd.*, 2024 WL 3643393, at *11 (quoting *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 643 (5th Cir. 2012)) ("Part of the reason behind the near-universal adoption of the percentage method in securities cases is that the PSLRA contemplates such a calculation.").

"Under the percentage-of-fund method, the district court may award plaintiffs' attorneys a percentage of the common fund, so long as that percentage represents a reasonable fee." *Stanger*, 812 F.3d at 738 (citing *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)). "The benchmark percentage is 25%, but, similar to the lodestar, the benchmark percentage 'can be adjusted upward or downward, depending on the circumstances.'" *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 784 (9th Cir. 2022) (quoting *Kim*, 8 F.4th at 1181). "[I]n assessing a request for attorneys' fees that was calculated using the percentage-of-recovery method," courts in the Ninth Circuit may consider "the extent to which class counsel 'achieved exceptional results for the class,' whether the case was risky for class counsel, whether counsel's performance 'generated benefits beyond the cash settlement fund,' the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency

basis." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015) (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002)).

"Whichever method is chosen, courts often employ the other method as a cross-check that the award is reasonable." *In re Apple*, 50 F.4th at 784. "Reasonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Stanger*, 812 F.3d at 739 (quoting *Fischel v. Equitable Life Assurance Soc'y*, 307 F.3d 997, 1007 (9th Cir. 2002)).

### 2.    Percentage-of-Fund Analysis

Analyzing the circumstances of this case under the percentage-of-fund method, the Court finds Counsel's departure from the 25% benchmark to 33.33% reasonable.

First, "[t]he overall result and benefit to the class from the litigation is the most critical factor in granting a fee award." *In re Omnivision*, 559 F. Supp. 2d at 1046. As discussed *supra* § III.D.2.ii, the Gross Settlement Amount reflects a 12.9% recovery of the maximum estimated damages, which exceeds recent median recovery percentages both nationwide and in similar securities class action settlements approved by courts in this Circuit. Although no benefits beyond the fund were generated, the results achieved by Counsel weigh in favor of an upward adjustment from the 25% benchmark.

Second, district courts commonly recognize securities class actions, such as this, to be complex and risky for plaintiffs counsel. *See, e.g.*, *In re Stable Rd.*, 2024 WL 3643393, at *12 ("While courts have always recognized that securities class actions are complex and carry significant risks, post-PSLRA rulings and empirical studies make it clear that the risk of no recovery has increased significantly."); *Kendall v. Odonate Therapeutics, Inc.*, No. 3:20-CV-01828-H-LL, 2022 WL 1997530, at *6 (S.D. Cal. June 6, 2022) ("In general, securities actions are highly complex and securities class litigation is notably difficult and notoriously uncertain.") (cleaned up). The risk inherent in securities class actions is compounded here because Counsel litigated this case on a contingency basis, with no surety of receiving compensation for over three and a half years of work or reimbursement of fronted costs. *See Vizcaino*, 290 F.3d at 1051 ("[C]ourts have routinely enhanced the

lodestar to reflect the risk of non-payment in common fund cases."). Additionally, as discussed *supra* § III.D.2.i, the risks of continuing to litigate through discovery, motions for summary judgment, trial, and any potential appeal were not insignificant. Even if such efforts were successful, continued litigation could reduce the assets available for recovery as Defendants' legal fees increased. (*See* Doc. No. 84-1 at 17.) Thus, the risk of litigation and the contingent nature of the fee support an upward adjustment.

Third, considering awards in similar cases, "'[d]istrict courts in this circuit have routinely awarded fees of one-third of the common fund or higher after considering the particular facts and circumstances of each case,' and the Ninth Circuit has upheld such awards." *Khoja v. Orexigen Therapeutics, Inc.*, No. 15-CV-00540-JLS-AGS, 2021 WL 5632673, at *9 (S.D. Cal. Nov. 30, 2021) (quoting *Beaver v. Tarsadia Hotels*, No. 11-cv-01842-GPC-KSC, 2017 WL 4310707, at *10 (S.D. Cal. Sept. 28, 2017)) (collecting cases); *see also, e.g.*, *Kendall*, 2022 WL 1997530, at *6 (finding 33.33% of the gross settlement fund to be reasonable in a securities class action that was litigated for 19 months on a contingency fee basis and resulted in a recovery of 3.49% of maximum estimated damages); *Mauss*, 2018 WL 6421623, at *6 (collecting cases where courts awarded 28–33% of the common fund for attorneys' fees in securities fraud class actions).

Based on the forgoing, the Court finds 33.33% a reasonable award under the percentage-of-fund analysis.

### 3. Lodestar Cross-Check

"Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050. "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 963–64 (9th Cir. 2003)). "Though the lodestar figure is 'presumptively reasonable,' the court may adjust it upward or downward by an appropriate positive or negative multiplier

reflecting a host of 'reasonableness' factors, 'including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment[.]'" *Id.* at 941–42 (quoting first *Cunningham v. Cnty. of Los Angeles,* 879 F.2d 481, 488 (9th Cir. 1988) and then *Hanlon*, 150 F.3d at 1029). However, "adjustments to the lodestar 'are the exception rather than the rule.'" *Stanger*, 812 F.3d at 738 (quoting *Fischel*, 307 F.3d at 1007).

Counsel represents that Pomerantz expended 1,489.31 hours on this case, resulting in a lodestar of $921,634.50. (Doc. No. 84-1 at 23; Van Decl. ¶ 42.) Counsel's hourly rates range from $975 to $1,325 for partners, $450 to $550 for associates, $690 for staff attorneys, and $365 for paralegals. (Van Decl. ¶ 42.) Plaintiff also represents that Pomerantz has "considerable experience litigating and successfully settling securities class actions for decades and recovering billions for injured investors." (Doc. No. 84-1 at 18.) Moreover, Counsels' rates are comparable to prevailing rates in this district in similar cases for counsel of comparable experience, skill, and reputation. *See e.g.*, *In re Qualcomm Incorp. Sec. Litig.*, No. 3:17-cv-00121-JO-MSB, Doc. Nos. 441 (S.D. Cal. Aug. 23, 2024), 450 (S.D. Cal. Sept. 27, 2024) (approving hourly rates ranging from $800 to $1,400 for partners, from $425 to $875 for associates, from $340 to $450 for staff attorneys, and $235 to $425 for paralegals and case managers); *In re Bofl Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC, 2022 WL 9497235, at *10 (S.D. Cal. Oct. 14, 2022) (finding hourly rates ranging from $385 for paralegals up to $1,150 for partners reasonable); *Ziegler v. GW Pharms.*, PLC, No. 21-CV-1019-BAS-MSB, 2024 WL 1470532, at *8 (S.D. Cal. Apr. 3, 2024) (finding hourly rates of $975 for a managing partner, $850 for a senior associate, $750 for of counsels, $475–575 for associates, $350 for staff attorneys, and $275 for support staff reasonable). As such, the Court finds Pomerantz's rates reasonable.

In reviewing the billing records, the Court finds the hours expended generally reasonable. Defendants specifically raise concerns over the reasonableness of the instant motion because no depositions were taken and post-certification the parties only engaged in "basic written discovery and responses thereto." (Doc. No. 88 at 3.) At the hearing,

Plaintiff's Counsel affirmed that prior to the parties' decision to attend mediation, deposition had been noticed. Considering Counsel's responses to the Court's questions at the hearing, and considering the complexity of a securities class action with multiple defendants, including entities and individuals located outside the country, the Court finds the hours billed reasonable, with the following limited exception. The Court has identified 38.26 hours Pomerantz billed for tasks that are clerical, "supervising" clerical work, trainings, or otherwise more "properly considered part of an attorney's overhead[.]"[3] *See In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 461 (C.D. Cal. 2014).

Excluding hours spent on clerical tasks, the requested amount of attorneys' fees represents a negative multiplier of approximately 0.88.[4] In securities class actions cases, "courts have approved multipliers ranging between 1 and 4." *In re Omnivision*, 559 F. Supp. 2d at 1048; *see, e.g.*, *In re Stable Rd.*, 2024 WL 3643393, at *15 ("A multiplier of 1.76 is well within the range of multipliers commonly awarded in securities class actions and other complex litigation."); *In re Immune Response*, 497 F. Supp. 2d at 1176 (finding a 1.47 multiplier reasonable for a securities class action where representation lasted six years on a contingency basis). A lodestar cross-check that results in a fractional multiplier supports the reasonableness of Counsel's requested percentage award. *See e.g.*, *In re Regulus Therapeutics Inc. Sec. Litig.*, No. 3:17-CV-182-BTM-RBB, 2020 WL 6381898 (S.D. Cal. Oct. 30, 2020) (finding a 0.94 multiplier reasonable); *Khoja*, 2021 WL 5632673, at *10 (finding a 0.528 multiplier a "strong indication of reasonableness").

---

[3]    For example, partner Alex Hood billed 0.5 hours ($487.50) to "[c]oordinate filing" a motion. (Doc. No. 96 at 2.) Partner Austin Van and associate Lauren Molinaro billed a combined 2 hours ($1,175.00) for attending software trainings. (*Id.* at 3, 23.) Associate Terrence Scudieri billed 3.3 hours ($1,716.00) for "[s]upervis[ing]" legal assistants filing documents and paying process servers. (*Id.* at 15, 20.)

[4]    The multiplier is achieved by dividing the requested attorneys' fees ($799,920.00) by the lodestar ($903,439.00). The instant motion and Van's declaration both state that, considering a lodestar of $921,634.50, the multiplier is 0.68. (Doc. No. 84-1 at 23; Van Decl. ¶ 46.) Upon the Court's calculation, it appears Plaintiff made a transpositional error, as the multiplier under Plaintiff's numbers is approximately 0.868.

### 4.    Conclusion

Court finds Counsel's request for $799,920.00 (33.33% of the $2.4 million Gross Settlement Amount) reasonable under the circumstances, particularly considering the substantial results achieved, the risk Counsel bore taking a complex securities class action on contingency, the similarity to other court-approved awards, and the lodestar cross-check. Accordingly, the Court **GRANTS** the instant motion with regard to Counsel's requested attorneys' fees.

### B.    Expenses

Counsel seeks an award of $166,383.87 for reimbursement of expenses, which is well within the $300,000 maximum authorized by the Settlement Agreement. (Doc. No. 84-1 at 25.)

| Expenses | Amount |
|---|---|
| Clerk Filing Fees | $639.00 |
| Online Computer Legal Research and Document Retrieval Fees | $3,285.64 |
| Discovery Vendor Fees | $40,556.60 |
| Deposition and Court Reporting Fees | $1,080.50 |
| Expert Fees | $84,274.75 |
| Investigator Fees | $15,460.21 |
| Mediator Fees | $15,287.04 |
| Overtime-Clerical | $277.85 |
| Photocopying Expenses | $89.90 |
| Postage and Overnight Mail | $519.48 |
| Press Releases and Newswires Fees | $1,951.80 |
| Process Server Fees | $2,230.00 |
| Translation Services Fees | $450.00 |
| Travel and Meal Expenses | $281.10 |
| **Total Expenses** | **$166,383.87** |

(Van Decl. ¶ 45.) At the Court's request, Van filed a supplemental declaration with invoices, expense records, and expert reports to substantiate the listed expenses. (*See* Suppl. Van Decl.; Doc. Nos. 93-1 through 93-8.)

"Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters." *In re Omnivision*, 559 F. Supp. 2d at 1048

(citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)). "In assessing the reasonableness of the reimbursement request, the Court is 'reminded that it is generally not the practice of an attorney to bill a client for every expense incurred in connection with the litigation in question,' and 'the attorney is expected to absorb some of the cost of doing business as an attorney.'" *In re Immune Response*, 497 F. Supp. 2d at 1177 (quoting *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1996)).

### 1.    Expert Costs

Counsel requests reimbursement for $83,994.75[5] in expert costs incurred by two firms: Stanford Consulting Group Inc. ("SCG") ($14,702.00) and Fideres Partners LLP ($69,292.75). (Van Decl. ¶ 45; Suppl. Van Decl. ¶ 4(c).)

Counsel hired Sorin Sorescu, Ph.D., of Fideres Partners to "analyze[] and evaluate[] the case and relevant materials related to market efficiency, in order to prepare his July 22, 2022 Expert Report for this case, which was filed in connection with Plaintiff's Motion for Class Certification." (Suppl. Van Decl. ¶ 4(c)(2); *see also* Doc. No. 93-6 (Dr. Sorescu's Expert Report).) In support of the $69,292.75 reimbursement request, Counsel provided a summary invoice of $4,000.00 (Doc. No. 93-5 at 2), a second summary invoice of $65,292.75 (*id.* at 3), and a detailed invoice breakdown for $57,261.74 (*id.* at 4–5). The detailed breakdown reflects work completed by a director and multiple analysts at hourly rates ranging from $385 to $1,120. (Suppl. Van Decl. ¶ 4(c)(2); Doc. No. 93-5 at 4–5.) At the hearing, Counsel explained that the $4,000 invoice was a flat data set up fee for access to information sources. (Doc. No. 98.) Additionally, Counsel provided a detailed breakdown of Dr. Sorescu's work at an hourly rate of $650.00. (*Id.*; *see also* Doc. No. 93-5 at 5; Suppl. Van Decl. ¶ 4(c)(2).)

Moreover, the Court notes that Dr. Sorescu's report is fifty-six pages and was relied upon by the Court in granting certification, which weighs in favor of reasonableness of the

---

[5]    Counsel requests $84,274.75, which includes a $280.00 process server fee. (*Compare* Van Decl. ¶ 45 *with* Suppl. Van Decl. ¶ 4(c).) The Court will consider the process server fees *infra* § IV.B.6.

request. *See, e.g.*, *In re Stable Rd.*, 2024 WL 3643393, at *16 (approving $41,261.00 for retention of experts as reasonable where the securities class action settled after surviving a motion to dismiss but before class certification briefing). Considering the documentation, case law, and explanation Counsel provided, the Court approves reimbursement of the $69,292.75 billed by Fideres Partners as reasonable.

Counsel retained Zachary Nye, Ph.D., and Faye Fort, Ph.D., of SCG to "analyze[] potential damages and provide[] detailed analysis in the case to allow Class Counsel to properly evaluate the value of the Class's Claims." (Suppl. Van Decl. ¶ 4(c)(1).) Based on invoices, Dr. Nye, Dr. Fort, and an SCG staffer assisted with drafting the Notice and Plan of Allocation. (Doc. 93-3 at 17.) Dr. Nye's hourly rates were $900 in 2022 and $990 in 2023, Dr. Fort's hourly rates were $750 in 2021 and $825 in 2023, and SCG staff rates hourly rates were $400—all of which Counsel asserts are consistent with rates accepted by courts in similar actions. (Suppl. Van Decl. ¶ 4(c)(1).) Based on the invoices, expert reports, and Van's supplemental declaration the Court approves reimbursement of $14,702.00 for work completed by SCG. *See, e.g.*, *In re Stable Rd.*, 2024 WL 3643393, at *16 (approving $41,261.00 for retention of experts as reasonable).

### 2.    Legal Research and Document Retrieval Fees

Counsel seeks reimbursement of $3,285.64 for legal research and document retrieval, incurred through use of Westlaw ($1,027.08), Pacer ($140.60), Bloomberg ($252.70), and Lexis ($1,865.26). (Van Decl. ¶ 45; Suppl. Van Decl. ¶ 4(a).) Counsel avers the charges incurred for Pacer use is based on "actual time," while for Westlaw, Bloomberg, and Lexis Pomerantz pays "a flat monthly fee and allocates the costs to a given case on a pro-rata basis" based on usage of the service by a specific matter as compared to total usage for all matters firm wide. (Suppl. Van Decl. ¶ 4(a); Doc. No 98 (hearing).) Accordingly, the Court approves $3,285.64 as reasonable for legal research and document retrieval. *See, e.g.*, *In re Stable Rd.*, 2024 WL 3643393, at *16 (approving $12,892.40 for online research where the securities class action settled after surviving a motion to dismiss but before class certification briefing).

### 3.   Deposition and Court Reporting Fees

Counsel requests $1,080.50 for "Deposition and Court Reporting Fees." (Van Decl. ¶ 45.) In Pomerantz's Detailed Matter Cost Report, this charge is listed as "Epiq Systems: Deposition Service Charges (Invoice # 90812935)." (Doc. No. 93-8 at 4.) However, at the hearing, Counsel explained that this charge was actually incurred by the Settlement Administrator, Epiq. (Doc. No. 98 (hearing).) As such, this charge would be contemplated in the settlement administration costs. *See supra* § III.F. Accordingly, the Court denies Counsel's expense request for the misclassified $1,080.50.

### 4.   "Overtime-Clerical Fees"

Counsel seeks $277.85 in "Overtime-Clerical Fees." (Van Decl. ¶ 45; Doc. No. 93-8 at 5.) Although Pomerantz's Detailed Matter Cost Report itemizes these fees by individual and date incurred, the Court views this request as part of the overhead costs typically built into the percentage fee. *See, e.g.*, *In re Quantum Health Res., Inc.*, 962 F. Supp. 1254, 1260 (C.D. Cal. 1997); *but see Kendall*, 2022 WL 1997530, at *7 (approving reimbursement for "clerical overtime" as reasonable). Accordingly, the Court excludes $277.85 from Counsel's expense request.

### 5.   Investigator Fees

Counsel requests reimbursement for $15,460.21 for expenses incurred by two investigation firms: On Point Investigations, LLC ("On Point") and Kelmar Global. (Van. Decl. ¶ 45; Suppl. Van Decl. ¶ 4(d).) Based on detailed billing invoices, On Point located, interviewed, and prepared memoranda on potential witnesses, including former employees. (Doc. No. 93-7 at 2–5, 7–12; *see also* Suppl. Van Decl. ¶ 4(d).) From July through November 2021, On Point invoiced Counsel for $13,912.50 in labor (79.5 hours billed at an hourly rate of $175) and $750.18 in database charges incurred finding potential witnesses and their numbers. (Doc. No. 93-7 at 2–5, 7–12.) Counsel avers that On Point's investigative work was "critical," particularly with drafting the Complaint. (Suppl. Van Decl. ¶ 4(d).) The Court finds On Point's rate, hours expended, and charges incurred reasonable. *See, e.g.*, *Mauss*, 2018 WL 6421623, at *9 (finding $39,675.75 incurred by On

Point reasonable); *In re Stable Rd.*, 2024 WL 3643393, at *16 (approving as reasonable reimbursement of $10,564.20 billed by a private investigation firm).

However, Kelmar Global's invoice lacks sufficient detail to allow the Court to determine the reasonableness of the charges incurred. (*See* Doc. No. 93-7 at 6 (billing $380 for "Investigator Labor" and $95 for "Report Generation").) As such, the Court declines to reimburse Counsel for Kelmar Global's fees ($475.00).

### 6.    Remaining Costs

Counsel seeks reimbursement for filing fees ($639.00), photocopying ($89.90), postage and overnight mailing ($519.48), process servers ($2,510.00),[6] translation services ($450.00), press releases and newswires ($1,951.80), and travel and meal expenses ($218.10), all of which are commonly reimbursed at similar amounts. *See, e.g.*, *Kendall*, 2022 WL 1997530, at *7 (reimbursing $56.147.94 in costs for "experts; investigative services; mediation services; travel, lodging, and meals; legal research; filing fees, courtesy copies, transcripts; press releases and newswires; clerical overtime; photocopies; mail expenses; and wire fee"); *Khoja*, 2021 WL 5632673, at *10 (approving reimbursement of "miscellaneous costs related to printing and photocopying, postage, transcript fees, mediation fees, court reporter fees, and court/filing fees" as those "typically incurred by counsel in complex litigation" and "routinely charged to clients billed by the hour"); *In re Immune Response*, 497 F. Supp. 2d at 1177 (approving reimbursement of "(1) meals, hotels, and transportation; (2) photocopies; (3) postage, telephone, and fax; (4) filing fees; (5) messenger and overnight delivery; (6) online legal research; (7) class action notices; (8) experts, consultants, and investigators; and (9) mediation fees").

Counsel requests reimbursement of $15,287.04 in mediation fees. (Van. Decl. ¶ 45.) Considering that the parties reached settlement through the assistance of this mediation,

---

[6]    This reflects the $2,230.00 in process server fees (*see* Van Decl. ¶ 45) plus the $280.00 process server fee listed under the expert fees (Suppl. Van Decl. ¶ 4(c)).

the Court finds this expense reasonable. *In re Immune Response*, 497 F. Supp. 2d at 1178 (granting reimbursement of mediation expenses as "reasonable and necessary").

Counsel seeks reimbursement of $40,556.60 for hosting of ESI discovery provided by vdiscovery from April 2022 through February 2024. (Van. Decl. ¶ 45; Suppl. Van Decl. ¶ 4(b); Doc. No. 93-2.) All invoices from vdiscovery specifically identify the instant matter. (*See* Doc. No. 93-2.) Considering the duration and amount of data hosted, the Court finds this expense reasonable. *Mauss*, 2018 WL 6421623, at *9 (finding reasonable $74,098.72 incurred for data hosting of electronic discovery services where 200,000 documents were reviewed and over twenty-five depositions were taken); *Fernandez v. CoreLogic Credco, LLC.*, No. 20CV1262 JM(SBC), 2024 WL 3209391, at *22 (S.D. Cal. June 24, 2024) (finding "$22,181.66 in e-Discovery hosting" reasonable where Counsel attested that he amount pertained only to data stored for that specific case).

Based on the foregoing, the Court approves the remaining costs as reasonable.

### 7. Conclusion

Subject to the issues raised above, the Court **GRANTS in part** Counsel's request for expenses and **APPROVES** a reduced amount of $164,550.52.[7]

### C. Class Representative's Service Award

Finally, in the instant motion, Plaintiff seeks an award $7,500.00 for his service as class representative. (Doc. No. 84-1 at 26–27.) The amount requested was not expressly defined in the Settlement Agreement or the Notice; however, both define "Litigation Expenses" as including reimbursement of "the costs and expenses" Plaintiff incurred "directly related to his representation of the Class." (Doc. Nos. 75-2 ¶ 1(aa); 75-4 ¶ 64.)

The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class" and expressly prohibits payment of incentive awards beyond "reasonable costs

---

[7]    $166,383.87 (requested) – $277.85 ("Overtime-Clerical Fees") – $1,080.50 (misclassified settlement administration cost) – $475.00 (Kelmar Global investigator fees) = $164,550.52 (awarded).

and expenses (including lost wages) directly relating to the representation of the class . . . ." 15 U.S.C. § 78u-4(a)(2)(A)(vi), (4); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 960, n.4 (9th Cir. 2009) ("The []PSLRA[] prohibits granting incentive awards to class representatives in securities class actions.").

Plaintiff details that he "took an active role in the litigation" and "diligently pursued the effective prosecution of this action." (Doc. No. 84-1 at 26–27; Csaba Decl. ¶ 8.) To that end, Plaintiff asserts he—

> (a) regularly communicated with Class Counsel by phone and email concerning case status, Court orders, and strategy, including with respect to pre-trial discovery and the collection of potentially relevant hard copy and electronic documents, and participated in strategic decisions regarding the posture and progress of the case, as well as litigation strategy; (b) authorized the filing of the motion seeking to be appointed as Lead Plaintiff and reviewed all significant pleadings and briefs filed in the Action, including the complaints, motions, and discovery requests; (c) reviewed Court orders and discussed them with Class Counsel; (d) evaluated and approved the proposed Settlement; and (e) reviewed the settlement documents.

(Csaba Decl. ¶ 8.)

In his supplemental declaration, Plaintiff states that his "typical hourly rate is 100 EUR (approximately $105.71) per hour for ad hoc engagements, or 60 EUR (approximately $63.42) per hour for longer-term projects." (Suppl. Csaba Decl. ¶ 5.) After reviewing notes and other documents, Plaintiff estimates that he spent "approximately 150 hours over the past three-plus years on duties as class representative." (*Id.* ¶ 4.) Accordingly, Plaintiff states that he could have otherwise earned between $9,513.00 and $15,856.50 but for his participation as class representative in this litigation. (*Id.* ¶ 5.) Despite his typical rates of compensation, Plaintiff seeks only $7,500.00 as reimbursement.

Plaintiff's method of calculation is commonly used by courts to calculate PSLRA service awards, and the total requested amount falls within the range deemed reasonable by other courts in this district for similar actions. *See, e.g.*, *Khoja*, 2021 WL 5632673, at *11 (awarding the lead plaintiff $9,230.00 who averred that he devoted approximately 48 hours to the case and that his average hourly rate is $192.30 based on his annual

compensation); *Mauss*, 2018 WL 6421623, at *10 (awarding the requested $7,500 to each lead plaintiff to compensate for 38 hours of work at a typical hourly rate of $250 and 50 hours at a typical rate of $165 per hour); *Patel v. Axesstel, Inc.*, No. 3:14-CV-1037-CAB-BGS, 2015 WL 6458073, at *9 (S.D. Cal. Oct. 23, 2015) (granting the lead plaintiff's request for $3,000.00 where he averred he worked 20 hours and that his average hourly rate is $150.00).

Although no previous filing expressly included Plaintiff's requested award, the Class was put on notice that litigation expenses would be requested for up to $300,000.00 and "may include" reimbursement to Plaintiff. (Doc. Nos. 75-2 ¶ 1(aa); 75-4 ¶ 64.) Because the combined request for other litigation expenses and Plaintiff's award in the instant motion do not exceed the noticed maximum of $300,000.00, the Court does not find this a barrier to granting Plaintiff's request.

Considering Plaintiff's contributions to this litigation, his typical rates of compensation, and the lack of objections, the Court **GRANTS** Plaintiff's request for a service award, finding $7,500.00 reasonable despite the Notice's lack of a definite number.

### D. Conclusion

Based on the foregoing, the Court **GRANTS in part and DENIES in part** Plaintiff's motion and **AWARDS** 33.33% of the Gross Settlement Amount for attorneys' fees, a reduced amount of $164,550.52 in litigation expenses, and $7,500.00 for Plaintiff's service as class representative.

## V.    CONCLUSION

For the reasons set forth herein, the Court:

1.    **GRANTS** Plaintiff's motion for final approval of settlement and plan allocation. (Doc. No. 83.) **As soon as practicable** and no later than **June 20, 2025**, Plaintiff **must file** both a Joint Motion for Dismissal of the action and a Status Report addressing:

        (i)    completion of payment to Authorized Claimants;

        (ii)    the final net per share recovery at payment; and

        (iii)    final itemized settlement administration costs

2. **GRANTS in part and DENIES in part** Plaintiff's motion for award of attorneys' fees, expenses, and a service award. (Doc. No. 84.) Specifically, the Court:

(i) **GRANTS** Counsel's requested 33.33% of the $2.4 million Gross Settlement Amount for attorneys' fees, and **AWARDS** counsel $799,920.00;

(ii) **GRANTS in part** Counsel's request for expenses, and **AWARDS** Counsel a reduced amount of $164,550.52; and

(iii) **GRANTS** Plaintiff's request for a service award, and **AWARDS** Plaintiff Gergely Csaba $7,500.00 as compensation for his efforts as class representative.

**IT IS SO ORDERED.**

Dated:  December 19, 2024

Hon. Anthony J. Battaglia
United States District Judge

21-cv-00687-AJB-MSB