UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MOHAMMED USMAN ALI, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

vs.

FRANKLIN WIRELESS CORP., OC KIM, and DAVID BROWN,

Defendants.

Case No.: 21-cv-00687-AJB-MSB

**DECLARATION OF JOSEPH MAHAN IN SUPPORT OF LEAD PLAINTIFFS' UNOPPOSED MOTION FOR CLASS DISTRIBUTION ORDER**

I, Joseph Mahan, hereby declare and state as follows:

1. I am a Settlement Project Manager employed by Epiq Class Action & Claims Solutions, Inc. ("Epiq").[1] This declaration is submitted in support of Lead Plaintiffs' Unopposed Motion for Class Distribution Order. The following statements are based on my personal knowledge and information provided by other Epiq employees working under my supervision and, if called on to do so, I could and would testify competently thereto.

2. Epiq was retained by Lead Counsel, subject to Court approval, to serve as the Claims Administrator in connection with the Settlement of the above-captioned class action (the "Action"). In the Order Granting Plaintiffs' Renewed Motion for Preliminary Approval of Class Action Settlement (the "Preliminary Approval Order"), the Court approved the retention of Epiq as Claims Administrator. ECF No. 77. In that capacity, Epiq has, among other things: (a) mailed

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Amended Stipulation and Agreement of Settlement dated February 26, 2024 ("Stipulation"). ECF No. 75-2

the Notice of Pendency and Proposed Settlement of Class Action ("Notice") and Proof of Claim and Release ("Claim Form" or "Proof of Claim") (collectively, the "Notice Packet") to Settlement Class Members and their brokers and other nominees; (b) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (c) created and continues to maintain a case-specific website and post relevant case-related documents on it;[2] (d) caused the Summary Notice to be published; (e) provided, upon request, additional copies of the Notice Packet to Settlement Class Members, brokers and other nominees; and (f) received and processed Claims.

3.    On December 19, 2024, the Court entered the Order Approving Plan of Allocation of Net Settlement Fund and the Judgement Approving Class Action Settlement.  ECF No. 99.

4.    Epiq has completed the processing of the 933 Claims received as of May 19, 2025, and hereby submits its administrative determinations accepting or rejecting the Claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants.

<u>**DISSEMINATION OF THE NOTICE**</u>

5.    As more fully described in the Supplemental Declaration of Joseph Mahan Regarding: (A) Mailing of the Notice Packet; (B) Publication of the Summary Notice; (C) Report of Claims Received to Date; and (D) Report on Requests for Exclusion Received to Date, dated July 25, 2024 (ECF No. 80-1), and the Supplemental Declaration of Joseph Mahan Regarding: (A) Mailing of the Notice Packet; (B) Report on Claims Received to Date; and (C) Report on Requests for Exclusion Received to Date, dated September 19, 2024 (ECF No. 85-1), as of September 19, 2024, Epiq had mailed 2,704 Notice Packets to potential Settlement Class Members, brokers and other nominees that may have purchased Franklin Securities on behalf of Settlement Class

---

[2] The case-specific website is: www.FranklinWirelessSettlement.com (the "Settlement Website").

Members.  Since that date, Epiq has not received any additional requests for remails of the Notice Packet. In total, Epiq has mailed 2,704 copies of the Notice Packet to potential Settlement Class Members, brokers and other nominees that may have purchased Franklin Securities on behalf of Settlement Class Members.  A copy of the Notice Packet is attached as Exhibit A.

6.       Under the provisions of the Preliminary Approval Order and as set forth in the Notice, each Settlement Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed Claim Form, along with supporting documentation for the transactions and holdings reported therein. Through May 19, 2025, Epiq has received 933 Claim Forms.

**PROCEDURES FOLLOWED IN PROCESSING CLAIMS**

7.       In preparation for receiving and processing Claims, Epiq: (a) conferred with Lead Counsel to define the project guidelines for processing claims; (b) created a unique database to store Claim Form details and images of Claim Forms and supporting documentation; (c) trained staff in the specifics of the project so that Claims would be properly processed; (d) formulated a system to properly respond to telephone and email inquiries; (e) developed various computer programs and screens for entry of claimants' identifying information, as well as their transactional information; and (f) developed a proprietary "calculation module" that would calculate Recognized Loss pursuant to the Court-approved Plan of Allocation set forth in the Notice.

8.       Settlement Class Members, and their banks, brokers, and other nominees, seeking to share in the Net Settlement Fund were directed in the Notice Packet to submit their Claim Forms online or postmarked by August 22, 2024, and referred to the Settlement Website and Notice for additional information on filing a Claim Form.  Among other things, the Settlement Website

3

allowed Settlement Class Members to submit Claims online and provided instructions for nominees on how to submit large Claims on behalf of multiple Settlement Class Members.

9. Of the 933 Claim Forms received by Epiq through May 19, 2025, 67 were paper Claim Forms or Claims submitted through the Settlement Website. Once received, paper Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying nonconforming sized documents, and sorting documents. This manual task of preparing the paper Claims is laborious and time intensive. Once prepared, the paper Claims were scanned into a database together with all submitted documentation. Each paper Claim Form was assigned a unique Claim Number. The information from each Claim Form, including the claimant's name, address, account number/information from his, her or its supporting documentation, and the purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form, was entered into the database developed by Epiq to process Claims submitted for the Settlement. Next, the documentation provided by each claimant in support of his, her or its Claim Form was reviewed to determine: (a) whether the claimant traded in Franklin Securities during the Settlement Class Period; (b) whether the transaction information entered on the Claim Form was supported by the documentation; (c) that the claimant did not have any additional trades not reflected on his, her, or its Claim Form; (d) that the name of the claimant matched the information on the trade documentation, or additional documentation was provided to support any name changes; and (e) that the beneficial owner on the trade documentation, or a valid representative, was the person who signed the Claim Form.

10. In order to process the Claims, Epiq utilized internal codes to identify and classify any deficiency or ineligibility conditions that existed within the Claims. The appropriate codes were assigned to the Claims as they were processed. For example, where a Claim Form was

submitted by a claimant who did not have any eligible transactions in Franklin Securities during the Settlement Class Period (*e.g.*, the claimant purchased Franklin Securities only before or after the Settlement Class Period), that Claim would receive a defect code that denoted ineligibility. Similar defect codes were used to denote other ineligible conditions, such as duplicate Claims. These message codes would indicate to Epiq that the claimant is not eligible to receive any payment from the Net Settlement Fund with respect to that Claim unless the deficiency was cured in its entirety. Examples of conditions of ineligibility are as follows:

| | |
|---|---|
| ND | No Documentation Submitted for the Entire Claim; |
| MD | Inadequate Documentation; |
| DP | Duplicate Claim; |
| PO | No Eligible Purchase During the Settlement Class Period; |
| SG | No Signature; |
| ZR | No Recognized Loss Under the Plan of Allocation; and |
| ZD | No Recognized Loss Due to Other Defects. |

11.    Because a Claim may be deficient only in part, but otherwise acceptable, Epiq utilized codes that were only applied to specific transactions within a Claim. For example, if a claimant submitted a Claim Form which, in addition to having eligible documented purchases, also listed shares that were transferred into the account but no supporting documentation demonstrating that the transferred shares had been purchased during the Settlement Class Period was provided, that transfer transaction would receive a transaction-specific defect code. That code indicated that the shares transferred into the account were not eligible, unless the defect was cured, but the Claim was otherwise eligible for payment based on the other transactions. Thus, even if the deficiency was never cured, the Claim could still be partially accepted. A few examples of transaction-specific message codes are as follows:

| | |
|---|---|
| BL | Claim Did Not Balance/Trade Discrepancy; |

| PR | Partial Documentation; |
|---|---|
| RC | Received Shares, Warrants or Units (*i.e.*, shares transferred into an account but not "purchased"); |
| DV | Delivered Shares, Warrants or Units (*i.e.*, shares transferred out of an account but not "sold"); |
| EN | No Proof of End Holdings; |
| IS | Ineligible Security; and |
| MR | Missing Information. |

12.     Of the 933 Claims received by Epiq through May 19, 2025, 866 were filed electronically ("Electronic Claims"). Electronic Claims are typically submitted by, or on behalf of, institutional investors who may have hundreds or thousands of transactions during the Settlement Class Period. Rather than provide reams of paper requiring data entry, the institutional investors or representatives filing Electronic Claims either mail a computer disc or electronically submit a file to Epiq so that Epiq may electronically upload all transactions to its proprietary database developed for the Settlement.

13.     Epiq maintains a Securities Team to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the Securities Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format, and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, Epiq notified the sender. If the electronic file was deemed to be in an acceptable format, it was then loaded to Epiq's database.

14.     Once the file was loaded, the Electronic Claims were coded to identify them as Electronic Claims and message codes were applied to denote any deficiencies or ineligible conditions that existed within them. These message codes are similar to those applied to paper and online Claim Forms. In lieu of manually applying message codes, the Securities Team performed programmatic reviews of the Electronic Claims to identify deficiency and ineligibility

6

conditions (such as, but not limited to, price per share/net amount validation issues, out of balance conditions, and transactions outside the Settlement Class Period, *etc*.).  The output was thoroughly verified and confirmed as accurate.

15.    The review process also included flagging any Electronic Claims that were not accompanied by a signed Claim Form, which serves as a "Master Proof of Claim Form" for all accounts referenced on the electronic file submitted.  This process was reviewed by Epiq's Securities Team and, where appropriate, Epiq contacted the institutional filers whose electronic files were missing information.  This ensures that all Claims are submitted by properly authorized representatives of the claimants.

16.    Finally, at the end of this process, Epiq performed various targeted reviews of the Electronic Claims.  Specifically, Epiq used criteria such as the calculated Recognized Loss amounts and other criteria to flag a sampling of electronic filers in order to request additional information, such as that specific purchases, sales and holdings selected by Epiq be documented with confirmation slips or other transaction-specific supporting documentation.  These targeted reviews help to ensure that electronic data supplied by claimants does not contain inaccurate information.  As set forth in ¶¶ 26-29 below, Epiq also performed additional quality assurance reviews in connection with the largest Claims.

### EXCLUDED PERSONS

17.    Epiq also reviewed all claims to ensure that they were not submitted by or on behalf of "Excluded Persons," to the extent that the identities of such persons or entities were known to Epiq through the list of Defendants and other excluded persons and entities set forth in the Stipulation and in the Notice, and through the claimants' certifications on the Claim Forms.  Epiq

7

also reviewed all Claims against the list of persons who were excluded from the Settlement Class pursuant to requests for exclusion.

**ADDITIONAL COMPLEXITIES ENCOUNTERED IN CLAIMS PROCESSING**

18.    Many of the Claims Epiq received were deficient or ineligible for one or more reasons and were, therefore, subjected to the additional processing, correspondence and telephonic communications described in Paragraphs 20-24 below.

19.    During the processing of Claims, Epiq also encountered "non-conforming" Claims, which, in general, require significantly more work than ordinary Claims because of the information contained in or missing from the Claims, or the manner in which the Claims were completed.  Non-conforming Claims include, among other conditions, missing pages, no name or address, Claim Forms that are blank but submitted with documentation for Epiq to complete, and Claim Forms that are so materially deficient as to make what is being claimed unrecognizable.

20.    Of the 67 paper Claims received as of May 19, 2025, 39, or approximately 58%, were incomplete or had one or more defects or conditions of ineligibility, such as the Claim Form not being signed, not being properly documented, or indicating no eligible transactions in Franklin Securities during the Settlement Class Period.  Much of Epiq's efforts in handling an administration involve claimant communications so that all claimants have a sufficient opportunity to cure any deficiencies and file a complete Claim.  The "Deficiency Process," which involved contacting claimants and responding to inquiries from claimants either by telephone or email, was intended to assist them in properly completing their otherwise deficient submissions so that they would be eligible to participate in the Settlement.

21.    If a Claim was determined to be defective or ineligible, a Notice of Deficient Claim Form Submission ("Deficiency Notice") was sent to the claimant describing the defect(s) or

8

condition(s) of ineligibility in his, her or its Claim and what was necessary to cure any "curable" defect(s) in the claim. The Deficiency Notice advised the claimant that the submission of the appropriate information and/or documentary evidence to complete the Claim had to be sent within 20 days from the date of the letter. The Deficiency Notice further advised that if the appropriate information was not submitted in this timeframe, the Claim would be recommended for rejection to the extent the deficiency or condition of ineligibility was not cured. The Deficiency Notice also advised claimants that if they desired to contest the administrative determination, they were required to submit a written statement to Epiq requesting Court review of the determination and setting forth the basis for their request. Attached hereto as Exhibit B is an example of the Deficiency Notice.

22.     Claimants' responses to the Deficiency Notices were scanned into Epiq's database and associated with the corresponding Claim Form. The responses were then carefully reviewed and evaluated by Epiq's team of processors. If a claimant's response corrected the defect(s), Epiq updated the database manually to reflect the change in status of the Claim.

23.     Of the 866 Electronic Claims received as of May 19, 2025, 625 were deficient or ineligible. Epiq used the following process to inform Electronic Claim filers that their electronic submissions were deficient. Each filer was sent an email attaching a report that listed the specific Claims that were deficient or ineligible, along with a list of the specific portions of the Claims that were deficient or ineligible (the "Transaction Report"). With respect to the Electronic Claims, the Transaction Reports:

      (a)     were sent electronically to filers who submitted deficient or ineligible Electronic Claims;

9

(b)      identified individual transactions and entire Electronic Claims that were found to be deficient or ineligible so that the filer had the opportunity to correct the deficient condition or contest the determination of ineligibility;

(c)      stated that any deficient transactions or Electronic Claims that remain uncured, as well as any transactions or Electronic Claims that were identified as ineligible, were rejected;

(d)      notified the filer that, within 20 days, it could request that the Court review Epiq's administrative determinations if it wished to contest the rejection of any transactions or Electronic Claims; and

(e)      provided Epiq's contact information if the filer had any questions or required assistance.

24.      Responses to the Transactions Reports were reviewed by Epiq's Securities Team, scanned and/or loaded into Epiq's database, and were associated with the corresponding Electronic Claim.  If the response corrected the defect(s) or affected the Electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect the change in status of the Electronic Claim.

## **DISPUTED CLAIMS**

25.      As noted above, filers were advised that they had the right to contest Epiq's administrative determinations of deficiencies or ineligibility within twenty days from the date of notification and that they could request that the dispute be submitted to the Court for review.  More specifically, such persons were advised in the Deficiency Notice or the Transaction Reports that if they disputed Epiq's determinations, they had to provide a statement of reasons indicating the grounds for contesting the rejection, along with supporting documentation.  Epiq received 2

requests for Court review. In an attempt to resolve the disputes without necessitating the Court's intervention, Epiq attempted to contact all of the persons requesting Court review, answer all of their questions, and fully explain Epiq's determination of the Claim's status, and attempted to facilitate the submission of missing information or documentation where applicable. Through May 19, 2025, Epiq was able to resolve the two requests received.

## **QUALITY ASSURANCE**

26. An integral part of Epiq's settlement administration projects is its Quality Assurance reviews. These reviews are also labor intensive and time consuming. Specifically, Epiq's personnel worked throughout the entire administration to ensure that Claims were processed properly; that deficiency and ineligibility message codes were properly applied to Claims; that deficiency notices were mailed to the appropriate claimants; and that Epiq's computer programs were operating properly.

27. In support of the work described above, Epiq staff designed, implemented and tested and reviewed the following programs for this administration: (a) data entry screens that store Claim information (including all transactional data included in each Claim and in any supporting documentation), attach message codes and, where necessary, apply text to denote conditions existing within the Claim; (b) screens for the analyst to review images of the Claim Form and any supporting documentation; (c) programs to load and analyze transactional data submitted electronically for all Electronic Claims (a load program converts the data submitted into the format required by the calculation program, and an analysis program determines if the data is consistent and complete); (d) a program to compare the claimed transaction prices against the reported market prices of Franklin Securities to confirm that the claimed transactions were within an acceptable range of the reported market prices; (e) a calculation program to analyze the transactional data for

11

all Claims, and calculate the Recognized Loss based on the Court-approved Plan of Allocation; and (f) programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible Claims.

28.    Epiq's Securities Team also performed a final quality control check once all of the accepted Claims were processed, deficiency notices were mailed, and deficiency responses were reviewed and processed, to ensure the correctness and completeness of all of the processed Claims before Epiq prepared its final reports to Lead Counsel. Here, in connection with this Quality Assurance wrap-up, Epiq: (a) confirmed that the Claims that are being recommended for approval have no message codes denoting ineligibility; (b) confirmed that Claims that are being recommended for rejection have message codes denoting ineligibility; (c) confirmed that all Claims requiring Deficiency Notices were sent such notices; (d) performed a sample review of deficient Claims; (e) reviewed a sampling of Claims with high Recognized Loss amounts to confirm Epiq's determinations; (f) sampled Claims that had been determined to be ineligible, including those with no Recognized Loss calculated in accordance with the Plan of Allocation, in order to verify that all transactions had been captured correctly; and (g) retested the accuracy of the loss calculation program.

29.    As part of its due diligence in processing the Claims, Epiq also conducted a "Questionable Claim Filer" search of all paper Claims and Electronic Claims filed in the Settlement as follows. Epiq maintains a database of known questionable filers. This database contains names, addresses, and aliases of individuals who have been investigated by government agencies for fraudulent claim filing, as well as the names and contact information compiled from previous settlements that Epiq has administered where fraudulent claims were received. Epiq updates the database on a regular basis. The database for the Settlement was searched for all

individuals identified in our Questionable Claim Filer Database.  Epiq performed searches based on name, aliases, address, and city/zip code.  In addition, all of Epiq's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including for Claims submitted by claimants not previously captured in our database as Questionable Claim Filers.  Processors are instructed to flag Claims as "Questionable Claims" and route them to the Project Manager and Securities Team for review.  3 were located, and rejected, as a result of these searches.  The claimants have not disputed the rejection of the Claims.

## LATE CLAIMS

30.    Through May 19, 2025, Epiq has received 2 Claims that were either postmarked or received after the August 22, 2024 Claim submission deadline established by the Court. This Claim was received approximately 6 months after the Claim filing deadline and after consultation with Lead Counsel has been denied.

## DISPOSITION OF CLAIM FORMS

31.    Epiq has completed the processing of the 933 Claims that were either postmarked or received through May 19, 2025, and has determined that 273 are acceptable in whole, 9 are accepted in part, and that 651 should be wholly rejected because they are either ineligible, wholly deficient, or have no Recognized Loss when calculated in accordance with the Court-approved Plan of Allocation.

32.    The 651 wholly rejected Claims are recommended for rejection by the Court for the following reasons:

## Summary of Rejected Claims

| Reason for Rejection | Number of Claims |
|---|---|
| Claim Did Not Result in a Recognized Loss | 125 |

| | |
|---|---|
| No Eligible Purchases During the Settlement Class Period | 501 |
| Deficient Claim with Condition of Ineligibility Never Cured | 13 |
| Claim Withdrawn/Voided by Request | 3 |
| Duplicate Claim | 7 |
| Late    (received after August 22, 2024) | 2 |
| **TOTAL**[3] | **651** |

33.    A list of the Claims and Epiq's recommendations as to their disposition is contained in the Administrator's Report attached hereto as Exhibit C.  Exhibit C-1, entitled "Timely Eligible Claims," lists all timely filed, accepted Claims, and states their Recognized Loss amounts and Exhibit C-2, entitled "Rejected Claims," lists all wholly rejected Claims, and states the reason for their rejection.  For privacy reasons, Exhibit C provides only the claimant's Claim Number and Recognized Loss amount or Reason for Rejection (no names, addresses, Taxpayer ID, or Social Security Numbers are disclosed).

34.    Epiq has determined that 282 Claims should be accepted.  The Claims recommended for acceptance represent total Recognized Losses of $3,044,195.99 under the Court-approved Plan of Allocation.

35.    According to the Court-approved Plan of Allocation, each Authorized Claimant will be allocated a *pro rata* share of the Net Settlement Fund based on his, her or its Recognized Loss in comparison to the total Recognized Loss of all Authorized Claimants.

---

[3] Several of the denied claims contain multiple rejection reasons.

14

**FEES AND DISBURSEMENTS**

36.      Epiq agreed to be the Claims Administrator for the Settlement in exchange for payment of its fees and expenses.  Lead Counsel received regular reports of and invoices for all of the work Epiq performed with respect to provision of notice and the administration of the Settlement and authorized the claims administration work performed herein.

37.      The cost of the administration of the Settlement through May 19, 2025, totals $52,679.78 of which all has been paid.  Additionally, Epiq has estimated that the cost of conducting the initial distribution of the Settlement, which will be reserved prior to the initial distribution, is $27,320.22.   Therefore, Epiq respectfully requests the Court approve fees in the amount of $80,000.  Should the estimate of fees and expenses to conduct the initial distribution exceed the actual fees and expenses, Epiq will refund the difference to the Net Settlement Fund once the initial distribution is completed. Copies of the current billed invoices are attached as Exhibit D.

38.      Should the Court concur with Epiq's determinations concerning the accepted and rejected Claims, Epiq recommends the following distribution plan (the "Distribution Plan"):

(a)      Epiq will conduct an initial distribution (the "Initial Distribution") of the Net Settlement Fund, after deducting the payments previously allowed and requested herein, and after payment of any Taxes, the costs of preparing appropriate tax returns, and any escrow fees as follows:

(i)      Epiq will calculate award amounts to all Authorized Claimants by calculating their *pro rata* share of the Net Settlement Fund in accordance with the Plan of Allocation.

(ii)      Epiq will, pursuant to the terms of the Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose *pro rata* share of the Net Settlement

15

Fund, as calculated under subparagraph (a)(i) above, is less than $10.00. Such claimants will not receive any distribution from the Net Settlement Fund and Epiq will send letters to those Authorized Claimants advising them of that fact.

(iii)    After eliminating claimants who would have received less than $10.00, Epiq will calculate the *pro rata* share of the Net Settlement Fund for Authorized Claimants who would have received $10.00 or more pursuant to the calculations described in subparagraph (a)(i) above ("Distribution Amount").

(iv)    In order to encourage Authorized Claimants to promptly deposit their payments, all distribution checks will bear a notation "DEPOSIT PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT NEGOTIATED WITHIN 90 DAYS OF ISSUE DATE."

(v)    Authorized Claimants who do not cash their Initial Distribution checks within the time allotted will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available to be re-distributed to other Authorized Claimants in the Second Distribution as discussed below. Similarly, Authorized Claimants who do not cash their second or subsequent distributions (should such distributions occur) within the time allotted will irrevocably forfeit any further recovery from the Net Settlement Fund.

(b)    After Epiq has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks, but no earlier than six (6) months after the Initial Distribution, if cost-effective to do so and in consultation with Lead Counsel, Epiq will conduct a second distribution of the Net Settlement Fund (the "Second Distribution") in which any unclaimed amounts remaining in the Net Settlement Fund after the Initial Distribution, after

16

deducting Epiq's fees and expenses incurred in connection with administering the Settlement for which it has not yet been paid (including the estimated costs of such Second Distribution), and after the payment of any Taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be distributed on a *pro rata* basis to all Authorized Claimants in the Initial Distribution who cashed their Initial Distribution check and would receive at least $10.00 from such distribution based on their *pro rata* share of the remaining funds and the August 22, 2024 Authorized Claimants.

(c)     In order to allow a final distribution of any funds remaining in the Net Settlement Fund after completion of the Second Distribution, whether by reason of returned funds, tax refunds, interest, uncashed checks, or otherwise, Epiq will conduct a further distribution of the Net Settlement Fund not less than six (6) months after the Second Distribution, if cost effective. All funds remaining in the Net Settlement Fund, after deducting Epiq's unpaid fees and expenses incurred or to be incurred in connection with administering the Net Settlement Fund (including the estimated costs of such distribution), and after the payment of any Taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be distributed to Authorized Claimants who cashed their Second Distribution checks in an equitable and economic fashion.  Additional re-distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter until Lead Counsel, in consultation with Epiq, determines that further re-distribution is not cost-effective.  At that point, the residual balance will be contributed—subject to Court approval—to Public Justice, a nonsectarian, not-for-profit 501(c)(3) organization.

(d)     Accept as provided for herein, (i) no new Claim Forms may be accepted after May 19, 2025; and (ii) no adjustments to Claim Forms, which would result in an increased

Recognized Loss amount may be accepted after May 19, 2025.  Should an adjustment be received that results in a lower Recognized Loss amount, that adjustment will be made, and the Recognized Loss amount will be reduced accordingly.

(e)   Unless otherwise ordered by the Court, one year after the Initial Distribution, or the Second Distribution if it occurs, Epiq will destroy the paper copies of the Claim Forms and all supporting documentation, and one year after all funds have been distributed, Epiq will destroy electronic copies of the same.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on May 19, 2025, at Philadelphia, Pennsylvania.

_Joseph Mahan_
_____
Joseph Mahan

*Mohammed Usman Ali, et al. v. Franklin Wireless Corp., et al.*
*Case No.:21-cv-00687-AJB-MSB*

*DECLARATION OF JOSEPH MAHAN IN SUPPORT OF LEAD PLAINTIFFS'*
*MOTION FOR CLASS DISTRIBUTION ORDER*

### *EXHIBIT TABLE OF CONTENTS*

| EXHIBIT | DOCUMENT NAME | PAGE # |
|---|---|---|
| A | Notice Packet | 20 |
| B | Deficiency Notice | 45 |
| C-1 | Timely Eligible Claims | 53 |
| C-2 | Rejected Claims | 61 |
| D | Billed Invoices | 76 |

**Exhibit Table of Contents to**
**Mahan Declaration**